723 A.2d 162

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Bryant ARROYO, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1997.

Decided Jan. 21, 1999.

William C. Costopoulos, Lemoyne, Allen C. Welch, Clearfield, for Bryant Arroyo.

Randall L. Miller, Langhorne, Joseph C. Madenspacher, Lancaster, Susan E. Moyer, for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## *OPINION*

CAPPY, Justice.

This is an appeal by allowance from the opinion and order of the Superior Court affirming the judgment of sentence of the Court of Common Pleas of Lancaster County. The primary issue in this matter is whether Bryant Arroyo's ("Appellant") right to counsel, as guaranteed by the Pennsylvania Constitution, was violated when the police refused to let an attorney speak with him following his waiver of his *Miranda* rights. For the following reasons, we now affirm.

On September 25, 1994 at 2:54 a.m., a Manheim Township police officer responded to a 911 call placed from the home of Appellant. When the officer arrived at the home, he found Appellant bent over Jordan Shenk ("Jordan"), who was the eight month old son of Pamela Shenk ("Shenk"), Appellant's girlfriend. Appellant stated to the police officer that he was performing cardiopulmonary resuscitation ("CPR") on the infant because he had found Jordan unresponsive in bed upstairs. The officer continued mouth-to-mouth resuscitation until an ambulance crew arrived at 2:56 a.m. At that time, Jordan was not breathing and had no pulse. The baby's skin was an ashen color, and he had approximately eleven purplish-brown marks on his lower chest and upper stomach. Jordan was transported to Lancaster General Hospital where he was pronounced dead at 3:40 a.m.

Appellant and Shenk arrived at police barracks on the morning of September 26, 1994 to be interviewed about the circumstances surrounding Jordan's death. They were questioned separately. Appellant was interviewed by Detectives Raymond Solt and Larry Mathias; upon arrival, Appellant was given a visitor's badge and was told he was free to leave at any time. The detectives also told Appellant that he was not under arrest, did not have to answer any questions put to him, and could leave the police barracks at any time.

At that point, Detective Solt orally gave Appellant his *Miranda*[1] warnings and then read those warnings from a preprinted waiver form; Appellant signed the form. N.T., Suppression Hearing, 97, 99. During the course of questioning, the detectives pointed out to Appellant several inconsistencies in his previous statements. At that juncture, Appellant admitted that he punched Jordan several times in the chest and stomach area because he was upset and took out his frustration on the baby.[2]

Shenk's interview with the police was shorter than Appellant's. At the end of her interview, she expressed a desire to speak with Appellant. N.T., Suppression Hearing, at 197. The police told Shenk she could not see Appellant at that time; Shenk then departed the barracks and returned to her home. *Id.* at 198.

During the course of police questioning of Appellant, Attorney Richard Gray ("Attorney Gray"), an attorney whom Shenk had contacted in the afternoon of September 26, 1994, telephoned the police barracks and requested to speak with

**1.** In *Miranda*, the Court determined that in order to effectuate a suspect's Fifth Amendment privilege against self-incrimination, the suspect must be told that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of counsel, and that counsel will be appointed if he cannot afford an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). These warnings are "not themselves protected by the Constitution but [are] instead measures to insure that the [suspect's] rights against compulsory self-incrimination [are] protected." *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182, 193 (1974). It is important to emphasize that the federal constitutional "right to counsel" of which a suspect is informed in his *Miranda* warnings springs not from the Sixth Amendment, but rather from the Fifth Amendment. *See Moran v. Burbine*, 475 U.S. 412, 432, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410, 428 (1986).

**2.** Appellant's confession reads as follows:

I went upstairs. That's when the game begins with the baby. I opened the door and went into the room. I picked him up and I started punching him.... I punched him with my left hand. I started punching him in the chest, stomach area. Then I laid him down on Ryan's bed and punched him some more.... I guess that I could say that I chose to take [my anger] out on him 'cause he's a baby and couldn't say anything that I hit him.

N.T., Vol. 3, at 470–472.

Appellant to determine if Appellant desired counsel.[3] Attorney Gray's request was refused. N.T., Vol. 4, at 619. During the course of his interview with police, Appellant was not informed that Attorney Gray had attempted to contact him.

After his confession, Appellant was arrested and charged with criminal homicide. Appellant filed pre-trial motions, asserting, *inter alia*, that his confession was involuntary and should have been suppressed. One of Appellant's arguments was that the police improperly withheld from him the information that while he was being interviewed at the police station, Attorney Gray telephoned the police and expressed a desire to speak with Appellant. The suppression court denied Appellant relief and Appellant proceeded to trial.

As one of its witnesses at the trial, the Commonwealth introduced the testimony of Dr. Wayne Ross, a forensic pathologist who conducted the autopsy and determined that Jordan's death was caused by severe and repetitive beating with a fist on the baby's abdomen and chest. Applying the principles of biomechanics and occupant kinematics [4], Dr. Ross opined that Jordan was struck approximately sixteen times, N.T., Vol. 2, at 242–243, with impact speeds of the blows "within the 20–mile–per–hour–range. . . . " N.T., Vol. 2, at 240. He concluded that Jordan's injuries were inconsistent with injuries related to CPR performed at the time Jordan was in full cardiac arrest. N .T., Vol. 2, at 248–249. He had several bases on which he rested his opinion. First, he stated that the presence of billions of white blood cells found in Jordan's abdomen at the site of the injuries indicated that the injuries which caused Jordan's death did not occur at the time he was in full cardiac arrest, which is when Appellant was

---

3. Appellant repeatedly claims in his brief to this court that Attorney Gray was his retained attorney. This is simply not correct. Attorney Gray himself stated at trial that he "was never retained." N.T., Vol. 4, at 620.

4. Dr. Ross defined biomechanics as "the study or the understanding of forces that are transmitted during types of trauma." N.T., Vol. 2, at 204. He defined occupant kinematics as the study of the movement of the body inside of a vehicle based upon evidence gathered from injuries to the human body and impact marks on surrounding structures. *Id*. at 204–205.

administering CPR, but had occurred approximately one hour before death had occurred. *Id.* at 249. Second, the appearance of the bruises on Jordan's abdomen also indicated to Dr. Ross that Jordan's injuries were inflicted approximately one hour before death. *Id.* at 250. Finally, Dr. Ross stated that the injuries were too extensive and severe to have been caused by CPR. *Id.* at 249.

Appellant was convicted by the jury of first degree murder, and a sentence of life imprisonment was imposed. Appellant, represented by new counsel, appealed to the Superior Court, which affirmed the judgment of sentence in a memorandum opinion. Appellant filed a Petition for Allowance of Appeal with this court, and review was granted.

As his first issue, Appellant contends that a suspect undergoing custodial interrogation at a police station must be informed that a defense attorney has attempted to contact him to determine whether he desired an attorney. Appellant claims that where, as here, the police fail to inform the suspect that an attorney is trying to contact him, then any waiver by the suspect of his *Miranda* rights is invalid and any incriminating statements made by the suspect must be suppressed as being violative of the Pennsylvania Constitution.[5]

Appellant recognizes that pursuant to *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), such police conduct does not violate the federal constitution. The *Moran* Court examined a situation whose factual scenario was strikingly similar to the one presented in the matter *sub judice:* the police refused to allow an attorney to speak with

5. We have reviewed a handful of cases over the past two decades which present factual scenarios similar to the one presented *sub judice.* In two of the cases, this court concluded that the accused's constitutional rights were not violated when police failed to tell the accused that an attorney was trying to contact the accused. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190 (Pa.1997); *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993). In another case, a plurality of this court reasoned that the failure of the police to inform the accused that an attorney wished to speak with him invalidated the accused's waiver of his right to counsel, rendering his confession involuntary. *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977). Yet, these cases did not examine these claims under the Pennsylvania Constitution. Thus, this is an issue of first impression for this court.

the defendant, who had validly waived his *Miranda* rights, during interrogation. The defendant in *Moran* challenged the conduct of the police, alleging that his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel had both been violated.

The *Moran* Court rejected these claims. As to the Fifth Amendment claim, it held that where a suspect executes a valid waiver of his *Miranda* rights, failure by the police to inform the suspect that an attorney tried to contact him does not invalidate the otherwise proper waiver. The Court reasoned that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421. Thus, the Court reasoned, the suspect's Fifth Amendment privilege against self-incrimination was not violated.

The *Moran* Court also rejected the defendant's claim that his Sixth Amendment right to counsel had been violated. The Court noted that the "right to counsel" of which *Miranda* warnings inform a suspect does not spring from the Sixth Amendment right to counsel, but rather is a judicially created procedural device by which the suspect's Fifth Amendment privilege against self-incrimination is protected. *Id.* at 424, 106 S.Ct. at 1142, 89 L.Ed.2d at 422. The Court explained that the Sixth Amendment right to counsel is distinct from the "right to counsel" mentioned in a *Miranda* warning. A suspect has a right to be told his *Miranda* warnings at the point custodial interrogation begins. *See id.* The Sixth Amendment right to counsel, on the other hand, "[b]y its very terms ... becomes applicable only when the government's role shifts from investigation to accusation." *Id.* at 430, 106 S.Ct. at 1146, 89 L.Ed.2d at 427. Therefore, a suspect has no Sixth Amendment right to counsel until the first formal charging proceeding has transpired, and it can be said that the formal initiation of adversarial judicial proceedings has occurred. *Id.* at 432, 106 S.Ct. at 1146, 89 L.Ed.2d at 428. The Court concluded that since the inculpatory statements at issue

in *Moran* were given prior to the defendant being charged with the crime, then the defendant had no Sixth Amendment right which could be violated. *Id.* The Court also specifically declined the defendant's invitation to extend the protections of the Sixth Amendment to the pre-arraignment phase of proceedings as such a holding would not be consistent with the Sixth Amendment's purpose of protecting an individual who is the focus of the state's prosecutorial power. *Id.*

Accepting that *Moran* foreclosed all federal constitutional claims in this matter, Appellant instead claims that his rights as guaranteed by the Pennsylvania Constitution are greater than those afforded by the United States Constitution, and that these state rights were violated when the police did not allow Attorney Grey to speak with him.[6] To examine this issue effectively, we must clarify what constitutional provisions are at issue here. Appellant recognizes that he has framed his issue as one which deprives him of his right to counsel pursuant to Article I, § 9, the state counterpart to the Sixth Amendment. He also claims, via a footnote, that his state right to due process and his privilege against self-incrimination were violated. Appellant's brief at 22 n. 4.

For the sake of clarity, we shall analyze Appellant's state constitutional claims in reverse order. As to his claim that his privilege against self-incrimination was violated, we first note that Appellant pays scant attention to this argument in his brief. In fact, his "argument" as to this claim rarely exceeds the level of boilerplate claims that this privilege was violated. Most strikingly, Appellant utterly fails to take cognizance of the fact that this court has repeatedly stated that, except for

6. Appellee contends that Appellant has waived any claims that his rights guaranteed by the Pennsylvania Constitution were violated because Appellant failed to present a full argument on this issue to the Superior Court. Appellee apparently finds fault with Appellant for failing to engage in a complete analysis of this state constitutional claim pursuant to the standards set forth in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). We must reject this argument as we have stated that an appellant's failure to engage in an *Edmunds* analysis does not result in waiver of a state constitutional claim. *Commonwealth v. Swinehart*, 541 Pa. 500, 509 n. 6, 664 A.2d 957, 961 n. 6 (1995).

the protection afforded by our Commonwealth's Constitution to reputation, the provision in Article I, § 9 which grants a privilege against self-incrimination tracks the protection afforded under the Fifth Amendment. *Commonwealth v. Morley*, 545 Pa. 420, 429, 681 A.2d 1254, 1258 (1996); *Commonwealth v. Swinehart*, 541 Pa. 500, 512–518, 664 A.2d 957, 962–965 (1995). Appellant provides no analysis as to why we should depart from this settled rule of law, and we can see no reason to do so at this juncture.

Furthermore, Appellant's references to a due process violation are hopelessly intertwined with his argument that his right to counsel was denied. As Appellant has failed to distinguish his due process argument from his right to counsel claim, we shall not separate it out and, in effect, raise an issue for him *sua sponte*.

■ Finally, we turn to the question of whether Appellant's right to counsel, as guaranteed by Article I, § 9 of the Pennsylvania Constitution, was violated when the police prevented Attorney Gray from speaking with him.[7] Before determining whether that right has been violated we must, as a threshold matter, determine whether Appellant's Pennsylvania Constitutional right to counsel had attached at the time Appellant made his inculpatory statements. As noted *supra*, the Sixth Amendment right to counsel, which is the correlative federal provision to the right to counsel as guaranteed by Article I, § 9, does not attach until the suspect has been charged with the offense in question. *See Moran, supra.* In order to find that Appellant's Article I, § 9 right to counsel had attached prior to his arraignment, which is the phase of proceedings at which he made the inculpatory statements, we would have to conclude that the right to counsel as guaranteed by our constitution is broader than that afforded by the federal constitution.

7. Appellant states that the following provision is at issue: "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel...." Pa. Const., art. I, § 9. The federal correlative to this provision is found in the Sixth Amendment.

■ In determining whether the Pennsylvania Constitution provides greater protections to the right to counsel than does the United States Constitution, we shall employ what has become known as the *Edmunds* analysis. That four-pronged test requires that we first review the text of the Pennsylvania constitutional provision; then, we review the history of the provision in question, including Pennsylvania case law; third, we consider related case law from our sister states; and, finally, we weigh policy considerations. *Edmunds,* 526 Pa. at 390, 586 A.2d at 895.

As to the first prong of the *Edmunds* analysis, we will first examine the language of Article I, § 9 to discern whether we can glean from it any direction on this specific issue. Next, we will compare the text of the right to counsel provision of the Pennsylvania Constitution to its federal correlative.

Article I, § 9 of the Pennsylvania Constitution states that "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel...." We conclude that the plain language of the provision militates in favor of a ruling that, as with the Sixth Amendment, the Pennsylvania Constitutional right to counsel attaches only upon the initiation of adversarial judicial proceedings since the right is granted only to an "accused" who is the subject of a "criminal prosecution". It is apparent that the language of the provision was not meant to encompass a situation, such as Appellant was in when he confessed, where a suspect is neither an "accused" nor the subject of "criminal prosecution".

■ Next, we compare the texts of the right to counsel provision as found in the United States Constitution and the Pennsylvania Constitution. The Sixth Amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." This provision is virtually identical to the one contained in Article I, § 9. Yet, we are mindful that similarity between federal and state texts is not dispositive in a determination as to whether a state constitutional right is coterminous with its federal counterpart. As we stated in *Edmunds,* we "are not

bound to interpret the two provisions [of the state and federal constitutions] as if they were mirror images, even where the text[s are] similar or identical." *Edmunds,* 526 Pa. at 391, 586 A.2d at 895–896.

Next, we review the history of the constitutional provision and Pennsylvania case law to determine if either is instructive on the question of whether the right to counsel attaches at an earlier stage than does the Sixth Amendment right to counsel. We have uncovered nothing in the historical literature which would indicate that Article I, § 9's right to counsel was meant to attach prior to the initiation of adversarial judicial proceedings.

As to the case law, we have found three matters in which this court discussed the right to counsel as guaranteed by this Commonwealth's constitution vis-a-vis the right to counsel as preserved by the federal constitution. *Commonwealth v. Franciscus,* 551 Pa. 376, 710 A.2d 1112 (Pa.1998); *Commonwealth v. Hess,* 532 Pa. 607, 617 A.2d 307 (1992); *Commonwealth v. Romberger,* 464 Pa. 488, 347 A.2d 460 (1975).[8] None of these opinions, however, is helpful in resolving this issue.

In *Franciscus,* the defendant was arrested and charged with criminal homicide. While imprisoned pending trial, the defendant befriended a fellow inmate to whom he made incriminating statements; unbeknownst to the defendant, this fellow inmate was a jailhouse informant. The issue we examined in *Franciscus* was whether a criminal defendant's right to effective assistance of counsel was violated when the Commonwealth obtained incriminating statements from him via a jailhouse informant. The bulk of the *Franciscus* opinion was spent determining that the federal constitutional provision had been violated. However, in a brief statement at the conclusion of the opinion, we also stated that the defendant's state

**8.** Appellant in his brief cites *Commonwealth v. Bussey,* 486 Pa. 221, 404 A.2d 1309 (1979) as another case in which this court determined that the right to counsel as guaranteed by the Pennsylvania Constitution is broader than the protection afforded by its federal counterpart. *Bussey,* however, was a plurality decision and thus has no precedential value.

constitutional right to counsel had also been violated. *Fran-ciscus,* at 395–396, 710 A.2d at 1121.

There was, however, no discussion in *Franciscus* as to when the Pennsylvania right to counsel attaches. The lack of such a discussion is hardly surprising since the defendant in *Franciscus* had been charged and was incarcerated awaiting trial when he made the incriminating statements; thus, there was no question that under such circumstances that the state's prosecution of the defendant had commenced and the defendant's federal and state rights to counsel had attached. Thus, we find *Franciscus* to be uninstructive.

In *Hess,* the question presented was whether the defendant's federal and state constitutional rights to counsel would be violated if the retainer paid by the defendant to his criminal defense attorney would have to be relinquished pursuant to a statute which declared that all monies derived from drug trafficking were forfeit to the state. We concluded that the operation of this statute would not violate defendant's federal constitutional right to counsel. *Id.* at 619, 617 A.2d at 313. Yet, we found that the forfeiture statute unconstitutionally interfered with the defendant's state constitutional right to counsel as it impermissibly deprived the defendant of his right to be represented by counsel of his choice. *Id.* at 620, 617 A.2d at 313–314.

*Hess* also does little to advance our analysis. *Hess* does, of course, show that in at least one particular, our constitution provides greater protections to the right to counsel than does the federal constitution. Yet, the fact that our constitution vigorously defends a defendant's right to choose his counsel has no bearing on the issue of whether the state right to counsel attaches at a stage earlier than does the Sixth Amendment right to counsel.

Finally, we turn to our *Romberger* decision. In that matter, this court examined the issue of whether a defendant's waiver of counsel was rendered unknowing and involuntary when he was not informed that counsel would be appointed if defendant were indigent. The court expressed the opinion that it was

uncertain what the result would be under federal constitutional law. Yet, it stated that pursuant to the Pennsylvania Constitution's right to counsel, a defendant must be informed that counsel will be appointed to him if he is indigent. *Id.* at 497, 347 A.2d at 464.

We find *Romberger* unhelpful, and in some senses unreliable, for two reasons. First, throughout the *Romberger* opinion the court confuses the concepts of a Sixth Amendment-type right to counsel and a "right to counsel" which springs from the privilege against self-incrimination. As discussed *supra*, these are two distinct rights. An opinion which liberally mixes these concepts is of suspect value. Secondly, *Romberger* did not discuss the issue as to when the right to counsel attaches, and thus provides no insight on the question before the court.

Having concluded that there is nothing in the history of Article I, § 9's right to counsel or in the case law interpreting that provision which would help us in our analysis, we now turn to the third prong of the *Edmunds* test and consider related case law from our sister states. The overwhelming majority of our sister states which have examined this issue have determined that their state constitutional right to counsel attaches at the same time the Sixth Amendment right to counsel attaches. *People v. Anderson,* 842 P.2d 621 (Colo. 1992); *Smith v. State,* 699 So.2d 629 (Fla.1997); *State v. Luton,* 83 Hawai'i 443, 927 P.2d 844 (Haw.1996); *Commonwealth v. Jones,* 403 Mass. 279, 526 N.E.2d 1288 (Mass.1988); *People v. Cheatham,* 453 Mich. 1, 551 N.W.2d 355 (Mich.1996); *State v. Willis,* 559 N.W.2d 693 (Minn.1997); *State v. Warren,* 348 N.C. 80, 499 S.E.2d 431 (N.C.1998); *State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994); *Poullard v. State,* 833 S.W.2d 270 (Tex.Ct.App.1992); *State v. Parizo,* 163 Vt. 103, 655 A.2d 716 (Vt.1994); *State v. Earls,* 116 Wash.2d 364, 805 P.2d 211 (Wash.1991); *State v. Legursky,* 195 W.Va. 435, 465 S.E.2d 892 (W.Va.1995); *Prime v. State,* 767 P.2d 149 (Wyo.1989). These courts reasoned that their state constitutional right to counsel provisions, as with the Sixth Amendment right to counsel, were meant to apply only after the commencement of

the adversarial judicial criminal proceedings against the defendant.

We have located two states which declare that their state constitutional right to counsel attaches earlier than does the Sixth Amendment right. *Ormond v. State,* 599 So.2d 951 (Miss.1992); *Ajabu v. State,* 693 N.E.2d 921 (Ind.1998). In *Ormond,* the Mississippi Supreme Court stated that the state constitutional right to counsel attaches at the "accusatory stage," a stage which the court defined as when a warrant is issued or when the suspect is bound over. *Ormond,* 599 So.2d at 956. The *Ormond* court, however, clearly would not extend the right to counsel to an individual who was merely being questioned by police, as was Appellant when he made the incriminating statements.

In *Ajabu,* the Indiana Supreme Court stated in *dicta* that a suspect might have a state constitutional right to counsel prior to the filing of charges if the suspect explicitly requested to consult with counsel. *Ajabu,* 693 N.E.2d at 928 n. 4. We find this reasoning is inapplicable to the matter *sub judice* because Appellant did not explicitly request counsel.

From our analysis of the opinions issued by our sister states, we conclude that the majority position of adhering to the federal rule on the attachment of the right to counsel is the most sensible. The plain language of Article I, § 9 limits the right to those situations where an "accused" is the subject of a "criminal prosecution". The terms "accused" and "all criminal prosecutions" are not mere verbiage with which we may summarily dispense. Rather, they are necessary terms which define the scope of this right. Were we to hold the attachment of the right to counsel is independent of the creation of an "accused" and the initiation of a "criminal prosecution," and is instead triggered by some earlier interaction between the police and the defendant, we would divorce this right from its constitutional basis. Such a holding would create a rootless, ethereal "constitutional" right which would have no foundation in the constitution of this commonwealth.

Finally, we must weigh the policy considerations for extending the right to counsel as guaranteed by Article I, § 9 so that this right attaches at an earlier stage than does its federal counterpart. Obviously, it would be advantageous for a suspect to have one more arrow in his quiver of constitutional rights. Recognizing a Sixth Amendment-type right to counsel at this stage of the proceeding would enhance the reliability of any confessions or statements produced at this stage. Yet, this is not the only concern to be weighed here. Countervailing the concerns of a suspect being interviewed by the police is the interest of the state in administering justice in a constitutional manner. Clearly, a holding by this court which would provide that every person being interviewed by the police had an Article I, § 9 right to counsel -- distinct from his *Miranda* right to counsel—would complicate the criminal investigative process. For example, the procedural safeguards for waiving a Sixth Amendment-type right to counsel are more onerous and would require judicial intervention at an earlier stage in the investigative process. We find that such a complication is simply not warranted. As discussed *supra*, the right to counsel, by its terms, does not apply where adversarial judicial proceedings have not commenced against the suspect. In balancing the desire of a suspect to be placed in as advantageous a position as possible against the administration of justice and the adherence to constitutional dictates, we determine that the scale weighs heavily against finding that Appellant's right to counsel had attached at this stage of the proceedings.

■ Our *Edmunds* analysis leads us to the inescapable conclusion that the right to counsel, as guaranteed by Article I, § 9 of the Pennsylvania Constitution, is coterminous with the Sixth Amendment right to counsel for purposes of determining when the right attaches. Therefore, Appellant had no Article I, § 9 right to counsel at the time he made his incriminating statements.[9]

9. As we have determined that Appellant had no right to counsel when he made his incriminating statements, there is obviously no need for us to address Appellant's claim that this right to counsel was violated.

Appellant's next claim is that it was error for the court to qualify Dr. Ross as an expert in biomechanics and occupant kinematics. In a related claim, Appellant contends that trial counsel was ineffective when he failed to cross-examine Dr. Ross on his qualifications.

In his claim that the trial court erred in qualifying Dr. Ross as an expert witness, Appellant first asserts that the Commonwealth failed to establish the general acceptance in the scientific community of biomechanics and occupant kinematics, and therefore the *Frye*[10] test for the admissibility of scientific evidence was not met here.

Yet, this was not the basis on which Appellant's trial counsel premised his objection. Specifically, Appellant's trial counsel objected because he believed that Dr. Ross "wasn't qualified as an expert in either of those fields [i.e., biomechanics and occupant kinematics] that he's going to testify to. He's only qualified as a forensic pathologist." N.T. 238. Appellant raised no objection on the basis that the study of biomechanics and occupant kinematics are not generally accepted in the scientific community, and that therefore such evidence is inadmissible pursuant to *Frye*. Rather, his objection was limited to challenging the particular qualifications of Dr. Ross in the disciplines of biomechanics and occupant kinematics. It is beyond cavil that "if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived...." *Commonwealth v. Stoltzfus,* 462 Pa. 43, 60, 337 A.2d 873, 881 (1975); *see also Commonwealth v. Witherspoon,* 481 Pa. 321, 324 n. 4, 392 A.2d 1313, 1314 n. 4 (1978). Therefore, Appellant's argument that the *Frye* rule was not satisfied here is waived.

10. The *Frye* test was enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). Pennsylvania courts continue to apply the *Frye* standard to determine whether scientific evidence is admissible even though the federal courts now employ the standard articulated in *Daubert v. Merrell Dow,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Commonwealth v. Blasioli,* 552 Pa. 149, 713 A.2d 1117, 1119, n. 1 (Pa.1998).

■ Appellant also asserts that Dr. Ross was not qualified to give an expert opinion relating to biomechanics or occupant kinematics. As noted above, it was on this specific basis that trial counsel lodged his objection, and therefore we may review this claim. We begin our review by noting that in this jurisdiction, "the standard for qualification of an expert witness is a liberal one." *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 480, 664 A.2d 525, 528 (1995). In determining whether a witness is qualified to testify as an expert, the trial court judge must determine whether the witness "has any reasonable pretension to specialized knowledge on the subject under investigation." *Id.* at 480–481, 664 A.2d at 528. We shall not reverse a trial court's determination that a witness is qualified to testify as an expert unless we find that the trial court abused its discretion. *Id.* at 481, 664 A.2d at 528.

■ We cannot find that the trial court judge abused his discretion here. Dr. Ross testified that he had received extensive training in the reconstruction of a crime scene, particularly in regards to damage caused to a human body in a motor vehicle accident. N.T., Vol. 2, at 204. He noted that biomechanics is an integral part of forensic pathology. *Id.* Also, he stated that he had authored several articles involving the study of occupant kinematics. *Id.* at 208. Furthermore, Dr. Ross had also lectured extensively, and testified in civil trials, on issues involving biomechanics and occupant kinematics. *Id.* at 207–209. We find Dr. Ross had established a "reasonable pretension" to knowledge of these areas, and therefore the trial court did not abuse its discretion when it allowed him to testify.

■ Appellant also contends that trial counsel was ineffective when he failed to cross-examine Dr. Ross on his qualifications in biomechanics and kinematics. To establish a claim of ineffective assistance of counsel, it is Appellant's burden to

> demonstrate that the underlying claim is of arguable merit; then, that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate Appellant's in-

terest; and, finally, that but for the act or omission in question, the outcome of the proceedings would have been different.

*Commonwealth v. Travaglia,* 541 Pa. 108, 118, 661 A.2d 352, 356–357 (1995). If it is clear that the prejudice prong cannot be met, the claim may be dismissed on that basis alone and there is no need to examine the other two prongs. *Id.* at 118, 661 A.2d at 357.

 Appellant claims that his ineffectiveness claim has merit because no evidence had been introduced that Dr. Ross had any expertise in biomechanics or kinematics, and cross-examination of Dr. Ross would have revealed that his expert opinion was entitled to little weight. This argument must be rejected. As stated above, Dr. Ross testified that he had received training in the reconstruction of accident scenes, particularly in the trauma inflicted on a human body in a motor vehicle accident; that he had delivered lectures and authored articles in which he discussed biomechanics and occupant kinematics; and that testimony he had given in civil trials has involved these areas of expertise. Clearly, evidence had been introduced showing that Dr. Ross had a reasonable pretension to knowledge about biomechanics and occupant kinematics. Appellant has presented this court with nothing more than bald claims that cross-examination of Dr. Ross would have diminished his credibility in the eyes of the jury. This is plainly insufficient to meet Appellant's burden of showing that his claim has arguable merit.

 Finally, Appellant raises two interrelated claims. He asserts that the trial court erred in failing to give a "no adverse inference" charge [11] to the jury and counsel was ineffective for failing to request that such a charge be given. As to the claim of trial court error, Appellant claims that the trial court here should have given, even without a request from Appellant's counsel, the no adverse inference charge

11. A "no adverse inference" charge instructs the jury that it may not hold against the defendant the fact that he exercised his constitutional right not to testify. *Commonwealth v. Thompson,* 543 Pa. 634, 636 n. 1, 674 A.2d 217, 218 n. 1 (1996).

since there was no on-the-record colloquy conducted where the defendant waived the right to have such a charge be given. Appellant claims that this court's decision in *Commonwealth v. Thompson*, 543 Pa. 634, 674 A.2d 217 (1996) militates that he is entitled to relief.

Appellant is correct in stating that *Thompson* mandates that a no adverse inference instruction must be given absent an express on-the-record colloquy by the defendant waiving the charge. *Id.* at 643, 674 A.2d at 221. Yet, we were explicit that this new rule of law was to be applied prospectively only. *Id.* As Appellant's trial occurred prior to the *Thompson* decision, he is entitled to no relief.

Appellant's related ineffectiveness claim also fails as Appellant has not established that he was prejudiced by the lack of the instruction in light of the overwhelming evidence of his guilt. The forensic evidence introduced by the Commonwealth established that Jordan's injuries had not been caused by Appellant's employing CPR at the time the child was discovered, but rather had been caused approximately an hour earlier. The Commonwealth also showed that these injuries were inflicted with a level of force which would exceed employment of CPR. Furthermore, the jury had before it Appellant's full and detailed confession to the crime. The inculpatory impact of this confession was heightened by the fact that it dovetailed with the forensic evidence, and showed that Jordan had not died due to CPR-related injuries, but rather was beaten to death by Appellant in a fit of rage. In light of all of this evidence, we find that the lack of a no adverse inference instruction did not prejudice Appellant; we simply cannot say that the jury would have been so swayed by such an instruction that the verdict here would have been different. Appellant therefore failed to meet his burden of proof on this claim.

For the foregoing reasons, we affirm the order of the Superior Court.