945 A.2d 744 (2008)
A.J.B., Appellant
v.
M.P.B., Appellee.
No. 14 MDA 2007.
Superior Court of Pennsylvania.
Argued January 9, 2008.
Filed March 12, 2008.
*745 James N. Bryant, Milheim, for appellant.
Jennifer P. Bierly, State College, for appellee.
BEFORE: STEVENS, ORIE MELVIN and BENDER, JJ.
OPINION BY BENDER, J.:
¶ 1 A.J.B. (Father) appeals from the order dated December 18, 2006, and entered on December 19, 2006, wherein the trial court denied his petition to modify an existing custody order. We affirm.
¶ 2 Father married M.P.B. (Mother) on July 31, 1999. The marriage produced a *746 daughter, G.P.B., born October 16, 2000. The marriage dissolved in 2002, and a divorce decree was entered on November 17, 2003. On November 16, 2004, the trial court entered an order awarding Mother primary physical custody of G.P.B. and granting Father periods of partial custody twice a week from 5:30 p.m. to 8:30 p.m. Father was also granted brief periods of physical custody during certain holidays, as long as it did not interfere with Mother's family gatherings. Father did not appeal the custody order. Instead, on February 4, 2005, Father filed a petition to modify the November 16, 2004 order. Mother countered with a petition for special relief, wherein she requested that the trial court direct Father to exercise his periods of physical custody in a public place. The genesis of this request was Mother's belief that Father regularly falls asleep during his time with G.P.B., leaving her without supervision. On May 11, 2005, the trial court granted Mother's petition for special relief, and it directed Father to conduct his periods of custody in a public place, which it subsequently defined as "a place where others will be present at all times." See Trial Court Order and Opinion (T.C.O.), 6/15/06.
¶ 3 Thereafter, following a contentious discovery period, an exchange of petitions for contempt, the appointment of a guardian ad litem, custody evaluations, a motion in limine, voir dire to determine the qualifications of Mother's proposed expert witness, and an evidentiary hearing, on December 19, 2006, the trial court entered an order denying Father's petition to modify the custody order. This timely appeal followed on December 29, 2006. On May 22, 2007, the trial court directed Father to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). On June 1, 2007, Father filed a Rule 1925(b) statement presenting three claims, which he reiterates on appeal as follows:
1. Did the [trial] court err in accepting the testimony of Ms. Reisman, a Ph.D. in Media Sciences, who had never seen either party, was not a psychologist and had never received any training in that field?
2. Did the [trial] court abuse it's [sic] discretion by blatantly disregarding findings of the independent psychologist and the father's psychiatrist when no evidence was offered to contradict either expert?
3. Did the [trial] court abuse it's [sic] discretion in finding that the father's conduct violated his prior order by not providing up to the minute information on where the father was with the child and finding that the father taking the child to local parks did not constitute public places as ordered by the court?
Fathers' brief at 4.
¶ 4 We begin by stating our standard of review.
[W]e note that on questions relating to an order of custody or visitation, our scope and standard of review are broad:
the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.
*747 Helsel v. Puricelli, 927 A.2d 252, 254-55 (Pa.Super.2007) (quoting Liebner v. Simcox, 834 A.2d 606, 609 (Pa.Super.2003)). Moreover, the paramount concern in a child custody case is the best interests of the child, based on a consideration of all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being and is to be made on a case-by-case basis. Wheeler v. Mazur, 793 A.2d 929, 933 (Pa.Super.2002). "Finally, we note that `[o]n issues of credibility and weight of the evidence, appellate courts must defer to the findings of the trial judge who has had the opportunity to observe the proceedings and the demeanor of the witnesses.'" Dranko v. Dranko, 824 A.2d 1215, 1219 (Pa.Super.2003).
¶ 5 The central issue in this case concerns Mother's objection to Father's pervasive use of pornography, which the parties concede precipitated the demise of their marriage. Father admits to viewing pornography several times every day, and Mother has consistently and vociferously alleged that Father is addicted to pornography. However, in a prior proceeding, the trial court reviewed a battery of psychosexual exams administered by Dr. William G. Allenbrough, II, a psychologist employed by Centre County to perform Megan's Law evaluations, and the court determined Father was not addicted to pornography. Likewise, all three of the psychologists who evaluated Father for the purpose of the underlying custody matter concluded that Father's use of pornography was not a threat to G.P.B.'s physical safety. Simply stated, the experts did not believe Father would sexually abuse a child.
¶ 6 Nevertheless, Father's fixation with pornography remains Mother's paramount concern as it relates to Father's relationship with G.P.B. Indeed, in challenging Father's petition to modify the existing custody order, Mother sought to present an expert witness, Dr. Judith A. Reisman, Ph.D., to testify about pornography, "brain science," and the probability of harm to G.P.B. if the court awarded Father extended, overnight visitation. N.T., 9/6/06, at 28; N.T., 8/22/06, 89-90. Father objected to Dr. Reisman's proposed testimony and filed a motion in limine to exclude it from the custody hearing because (1) Dr. Reisman was not qualified as either a psychologist or psychiatrist and (2) Dr. Reisman's scientific evidence was not generally accepted in the relevant scientific community under Frye v. U.S., 293 F. 1013 (D.C.Cir. 1923), and Grady v. Frito-Lay, 576 Pa. 546, 839 A.2d 1038, 1044 (2003).
¶ 7 During the subsequent voir dire, Mother indicated that she was presenting Dr. Reisman as an expert in mass media, erotic media, academic human sexuality, programmatic training and the causes and prevention of child abuse. N.T., 9/6/06, at 9. As to her specific qualifications, Dr. Reisman testified that she had a doctoral degree in mass media communications and systems analysis, which she defined as follows:
[T]he analysis of the various forms of communication on human perception . . . [including] radio and . . . television production techniques, mass media effect studies, persuasion theory . . . subconscious programming in mass media, . . . [c]ontent analysis methodology, [and] marketing and advertising research.
Id. at 13. Dr. Reisman's primary mark of distinction is a study she authored for the Department of Justice entitled, Images of Children, Crime and Violence in Playboy, Penthouse and Hustler. That study examined images of children in pornographic magazines, between 1954 and 1984.
¶ 8 Father countered Dr. Reisman's testimony by introducing two exhibits. The first exhibit, a research paper by Anthony *748 D'Amato, a Professor at Northwestern University School of Law, did not address Dr. Reisman or her findings directly. It merely identified an inverse relationship between the increased availability of pornography and a decline in sexual violence over the past twenty-five years. Father simply asserted that Professor D'Amato's study implicitly invalidated Dr. Reisman's reasoning. However, Father's second exhibit, an Internet article, directly disputed Dr. Reisman's research, arguing that her expert opinions were "based less on scientific fact than on innuendo that says more about the mind that casts it than the subject to which it is addressed." Plaintiff's Exhibit 2, 8/6/06, at 1. The article also challenged Dr. Reisman's Justice Department study with the following criticism:
This is not science, it's vigilantism: paranoid, pseudoscientific hyperbole with a thinly veiled hidden agenda. . . . [Dr. Reisman's] study demonstrates gross negligence and while she seems to have spent a lot of time collecting her data, her conclusions, based on the data are completely unwarranted. The experts [Dr.] Reisman cites are, in fact, not experts at all. . . .
Id. at 3 (quoting Avedon Carol, Nudes, Prudes and Attitudes: Pornography and Censorship, 156). Father did not present any testimony or subject Dr. Reisman to cross-examination. His motion rested essentially on the two exhibits.
¶ 9 Following voir dire, on September 14, 2006, the trial court entered an order denying Father's motion in limine, and it directed that,
[Dr. Reisman] shall be permitted to testify as an expert witness on the general issues of mass media, erotic media, academic human sexuality, programmatic training, the causes and prevention of child sexual abuse, the brain science behind pornography addiction, and the effects of pornography [addiction] on families and communities in the above captioned matter. Dr. Reisman is precluded from specifically testifying as to any potential effects [Father's] pornography may have on [him].
T.C.O., 9/14/06, at 1.
¶ 10 Thereafter, during the hearing on Father's underlying motion to modify the existing custody order, Dr. Reisman submitted an expert report for the court's review. That report mostly rehashed evidence the court had previously confronted, weighed, and ruled upon in prior proceedings, and the report challenged the findings and conclusions of the psychologists that had testified in the earlier proceedings. Curiously, Dr. Reisman, who the trial court specifically precluded from testifying as to pornography's effect on Father, purposefully overstepped the bounds of her putative expertise as determined by the trial court, denounced both of the court appointed experts, and unilaterally concluded that Father not only was addicted to pornography but that he also posed a threat to abuse G.P.B. sexually. Fortunately, the trial court ignored Dr. Reisman's unsolicited rhetoric on these matters. As noted below, however, the court did incorporate one aspect of Dr. Reisman's testimony into its decision to deny Father's motion.
¶ 11 Father's first issue challenges the trial court's decision to permit Dr. Reisman to proffer her expert testimony regarding the brain science behind pornography addiction. The crux of Father's complaint is that Dr. Reisman's credentials in mass communications and pornographic mass media did not make her competent to testify as an expert regarding Father's personal use of pornography. Further, Father complained that Dr. Reisman's testimony incorporated novel scientific theories including the propositions that the use *749 of pornography alters the structure of the human brain over time and the idea that the cumulative affect of pornography use upon the human brain causes "the pornographic reality [to] [become] the viewer's reality." Father's brief at 16. Father also challenges Dr. Reisman's explanation of the "brain science" behind pornography addiction. Id. Father argues that the court committed an abuse of discretion in finding Dr. Reisman qualified to proffer an expert opinion on the above-mentioned topics and in finding that her novel scientific theories were generally accepted in the relevant scientific community. To the extent the trial court permitted Dr. Reisman to testify as an expert witness concerning the cumulative affect of pornographic images on the human brain and impute her general testimony to Father, we find the trial court abused its discretion.
¶ 12 The admission of evidence, including expert scientific testimony, is within the purview of the trial court's discretion. In re C.M.T., 861 A.2d 348, 355 (Pa.Super.2004). As this court has stated, "[t]he decision to admit or to exclude evidence, including expert testimony, lies within the sound discretion of the trial court. Generally, we review a trial court's evidentiary rulings for abuse of discretion[.]" Id. (internal quotations and citations omitted). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." Bulgarelli v. Bulgarelli, 934 A.2d 107, 111 (Pa.Super.2007) (quoting Laws v. Laws, 758 A.2d 1226, 1228 (Pa.Super.2000)).
¶ 13 Pursuant to Pa.R.E. 702, "if scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Our Supreme Court has made clear, "the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." Miller v. Brass Rail Tavern, 541 Pa. 474, 664 A.2d 525, 528 (1995) (emphasis in original). Further, the assessment of a proposed expert's qualifications occurs prior to trial, and it is not affected by the substance of any subsequent testimony. See In re K.C.F., 928 A.2d 1046, 1050 (Pa.Super.2007).
¶ 14 However, Rule 702 does not alter Pennsylvania jurisprudence utilizing the exclusionary rule governing the admission of expert testimony concerning novel scientific evidence and the standard articulated in Frye to determine the reliability of novel scientific principles. See Pa.R.E 702, Comment; Miller, 664 A.2d at 528; see also Grady, 839 A.2d at 1044 (Frye rule will continue to be applied in Pennsylvania); and Commonwealth v. Topa, 471 Pa. 223, 369 A.2d 1277 (1977) (adopting Frye standard). The Frye standard is simply whether the party proffering the novel scientific evidence has demonstrated that the principles and methodology the scientist employed has gained general acceptance in the relevant medical community. See Trach v. Fellin, 817 A.2d 1102, 1112 (Pa.Super.2003) (en banc). Admissibility is not tied to the general acceptance of the expert's scientific conclusion. Id.
¶ 15 Thus, as it relates to the case sub judice, Father's arguments would normally require a two part analysis: first, whether Dr. Reisman possessed a specialized *750 knowledge that would aid the court's understanding of pornography so as to permit the court to determine whether Father's use of pornography posed a threat to G.P.B., and second, if Dr. Reisman possessed a specialized scientific knowledge, whether the scientific evidence that she presented has general acceptance in the relevant scientific community. See Grady, 839 A.2d at 1046; Commonwealth v. Arroyo, 555 Pa. 125, 723 A.2d 162, 170 (1999). As we conclude that the trial court abused its discretion in finding Dr. Reisman's expertise in the field of mass media communications made her competent to proffer her expert opinion in the custody case at bar, we do not reach the second inquiry concerning the general acceptance of her scientific principles and methods.
¶ 16 Herein, we believe that Dr. Reisman had a reasonable pretension to specialized knowledge as to most of the subjects that the trial court found her qualified to discuss. However, as noted above, we do not believe the record supports her qualification as an expert relating to the physical effect extended use of pornography has upon the brain so as to impair the user's ability to distinguish between reality and pornographic fantasy. Moreover, since Dr. Reisman is not a physician, psychiatrist, or even a psychologist, her qualifications were limited to general human responses to pornography and academic sexuality. She was not qualified to discuss the psychological effect that prolonged use of pornography has upon any individual, including Father. In an apparent recognition of this patent limitation, Dr. Reisman opined during voir dire that human brains respond to stimuli identically. N.T. Voir Dire, 9/6/06, at 35-37. However, unfortunately for Mother, Dr. Reisman did not support this conclusion with relevant scientific data. Indeed, cognizant of this limitation, the trial court specifically excluded from Dr. Reisman's testimony, "any potential effects [Father's] pornography use may have on [him]." Nonetheless, the court failed to heed its own warning, and in denying Father's petition to modify the support order, the trial court incorporated Dr. Reisman's conclusion as it related specifically to Father, stating,
Of most significance to this Court and to this case, Dr. Reisman testified that individuals who use pornography extensively often do not have or lose personal boundaries and are unable to distinguish between their `pornographic world' and `the real world.' This lack or loss of boundaries often leads to loss of judgment, which could obviously have a negative affect or impact on a child's welfare.
T.C.O., 12/19/06, at 3-4.
¶ 17 While Dr. Reisman clearly was qualified to present her expert opinion regarding pornography in mass media, erotic media, academic human sexuality, and pornography's effect on society generally, those concerns were not relevant to the trial court's determination. Pursuant to Pa.R.E. 401, to be considered relevant, evidence must have some tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As the case sub judice did not involve a question of fact concerning pornography in relation to mass media, its effect on society, or academic human sexuality, an expert opinion regarding those subjects was not relevant to the court's determination. Further, Dr. Reisman also was decidedly without proper qualifications to address the effect of pornography addiction on Father's parenting ability, especially in light of the fact that the trial court previously concluded that Father was not addicted *751 to pornography. T.C.O., 11/16/04, at 5. Hence, the subject matter that Dr. Reisman was undoubtedly qualified to discuss as an expert witness was not relevant to Father's ability to exercise custody over G.P.B. Irrelevant evidence is inadmissible. Pa.R.E. 402.
¶ 18 Having addressed Father's contention that the trial court erred in qualifying Dr. Reisman as an expert and finding that the trial court committed an abuse of discretion to the extent it interpreted Dr. Reisman's expertise in mass media communications as relevant, admissible expert testimony in this case and in relying upon that testimony, in part, to draw its own conclusion regarding Father's lack of proper judgment, we do not confront the related Frye issue to determine the reliability of the putative novel scientific evidence. Nevertheless, in addressing Father's remaining issues, we conclude that the trial court's evidentiary error was harmless, and we affirm the trial court's order denying Father's motion to modify the existing custody order.
¶ 19 To constitute reversible error, an evidentiary ruling must be both erroneous and prejudicial to the complaining party. Conroy v. Rosenwald, 940 A.2d 409, 417 (Pa.Super.2007). As noted above, in denying Father's motion, the trial court incorporated Dr. Reisman's conclusions concerning the effect prolonged exposure to pornography has upon the brain so as to impair the user's ability to distinguish between reality and pornographic fantasy. From that conclusion, the trial court extrapolated the principle that the user's impairment leads to a loss of judgment. T.C.O., 12/16/06, at 4. Next, the trial court noted several situations in this case where Father had demonstrated unsound judgment by ignoring the express terms of the court's prior custody orders including, failing to conduct his periods of physical custody in a populated public area, failing to inform Mother of the planned activities and G.P.B.'s location during the periods of physical custody, and by posting G.P.B.'s photograph as part of his entry on dating websites. Id. Those instances led the court to ultimately determine that Father was unable to supplant his own needs and interest for G.P.B.'s. Id. Therefore, finding that Father's lack of judgment could have a detrimental effect on G.P.B., the court denied Father's motion for increased custody. Id.
¶ 20 Notwithstanding Father's assertions to the contrary, the record supports the trial court's determination. During the custody hearing, Mother testified that, despite the trial court's June 15, 2006 order defining a public place as a place "where others will be present at all times," Father took G.P.B. to unpopulated areas during his periods of partial physical custody, explaining that, while Father and G.P.B. often visit public areas such as parks and school playgrounds, they are normally the only people at the location. N.T., 8/22/06, at 115-16. Similarly, Mother testified that Father seldom complied with the portion of the June 15, 2006 order directing Father to telephone Mother and inform her of his plans for his visit with G.P.B. Id. at 113-14. Mother testified that Father normally e-mails his plans to her well into the visit, or he summarizes their activities after the visit has concluded. Id. at 114. Father did not contradict either aspect of Mother's testimony.
¶ 21 Moreover, as Mother accurately observes, the record is replete with additional instances demonstrating Father's unsound judgment. Father has fallen asleep during his limited periods of custody and on other visits with G.P.B.N.T., 8/22/06, at 68. On multiple occasions, Father allegedly started to play videotape recorded movies for G.P.B. fully aware that they did not *752 have sufficient time to view the entire movie before the allotted custody period expiredprompting G.P.B. to inform Mother, "Daddy says we do not have enough time together." Id. at 101-103. In addition, having promised that he would attend a dance recital that occurred during a regularly schedule period of custody, Father not only missed the recital, he mistakenly went to Mother's home to retrieve G.P.B. for their visit. Similarly, Father promised to participate in several activities at G.P.B.'s pre-school, and he appeared only one time. Id. at 99. On one occasion, Father took G.P.B. hiking while she was wearing slip-on sneakers, and when she returned to Mother's home, her feet had blistered. N.T. 6/7/06, at 8-10. On another occasion, G.P.B. was hiking with Father and needed to urinate, lacking toilet paper, Father allegedly advised her to wipe herself with her hand. Id. at 8, 9; N.T., 8/22/06, at 117. Moreover, while G.P.B. has been in his custody, Father has allegedly undressed G.P.B. in public at the public swimming pool. Id. at 106. All of the foregoing examples support the trial court's determination that Father experiences lapses of judgment that could have a detrimental effect on G.P.B.'s safety and well-being. As this finding is clearly supported by the record, the trial court had independent ground for denying Father's petition to extend custody apart from its reference to the improperly admitted evidence submitted by Dr. Reisman. Hence, the error was harmless. Accordingly, we affirm the trial court's December 19, 2006 order denying Father's request to modify the existing custody order.
¶ 22 Order affirmed.
¶ 23 Judge ORIE MELVIN concurs in the result.