J-A08005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO: M.L.K., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M.R., A/K/A, J.K., MOTHER | : : : : : | |
| | : | No. 3396 EDA 2016 |

Appeal from the Decree October 6, 2016
in the Court of Common Pleas of Lehigh County
Orphans' Court at No(s): No. A2015-0050

BEFORE:   PANELLA, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, J.                         **FILED April 25, 2017**

Appellant, J.M.R., a/k/a, J.K. ("Mother") appeals from the decree

entered October 6, 2016, in the Court of Common Pleas of Lehigh County,

Orphans' Court Division, involuntarily terminating the parental rights of

Mother to her daughter, M.L.K. ("Child") (born in April 2013), pursuant to

the Adoption Act, 23 Pa.C.S.A. § 2511(a)(8) and (b).[1] We affirm.

The relevant facts and procedural history of this case are as follows.

Mother and Father are married, but living separate and apart. Mother

---

[*] Former Justice specially assigned to the Superior Court.

[1] By separate decree, the orphans' court involuntarily terminated the
parental rights of biological father, C.K. ("Father"). Father is not a party to
this appeal nor did he file a separate appeal.

1

currently resides with her new boyfriend.[2] Prior to Child's birth, Mother and Father had three older children, two of whom have genetic abnormalities and require special care and medical attention. In 2009, Lehigh County Office of Children and Youth Social Services ("LCOCYS") received allegations that Mother and Father were homeless, lacked sufficient food, and had snakes in the trunk of their car. After a lengthy period of noncompliance with court-ordered services, Mother's and Father's parental rights to their three eldest children were involuntarily terminated on March 19, 2013.

Based on the termination of her parental rights to her three older children, LCOCYS had safety concerns for unborn Child, due in April 2013. As such, LCOCYS devised a plan with Mother that would provide for the safety of Child while allowing her to reside in Mother's care. The safety plan entailed: (1) Mother's ongoing communication with LCOCYS; (2) Child's attendance in a therapeutic daycare called Safe Start; and (3) the parents' allowing LCOCYS caseworker, Heather Reed ("Ms. Reed") into the home to check on Child. LCOCYS also provided Mother with Valley Youth House in-home services, which was the same in-home services utilized to reunify Mother with her three older children.

LCOCYS received notification that Child was born from a referral and not from parents. When LCOCYS contacted Mother, she refused to cooperate

---

[2] Mother has a fifth child by her live-in boyfriend. Mother's fifth child is not in foster care and resides with Mother and her boyfriend.

with the agreed upon safety plan for Child. LCOCYS obtained an Emergency Protective Custody Order for Child on April 12, 2013. The next day, Child was discharged from the hospital directly into foster care, where she currently remains and has lived for her entire life.

On April 23, 2013, Child was adjudicated dependent and placed into the physical and legal custody of LCOCYS. At the adjudication hearing, Mother was court-ordered to comply with a Family Service Plan ("FSP"), which set the goal of reunification with Child. Mother's FSP goals were: (1) to maintain appropriate legal income and stable housing; (2) to cooperate with LCOCYS and all other recommended services; (3) to cooperate with Valley Youth House or other in-home services; (4) to complete a mental health evaluation and comply with recommendations; and (5) to comply with medical treatment and services for Child. Mother was familiar with these FSP goals as they were previously court-ordered of her regarding her three eldest children.

Several permanency review hearings were held between 2013 through 2016. On October 12, 2015, LCOCYS filed petitions to involuntarily terminate Mother's and Father's parental rights to Child. On February 19, 2016 and April 8, 2016, the orphans' court held hearings on LCOCYS' termination petitions. At the hearing on February 19, 2016, LCOCYS presented the testimony of Linda Coleman ("Ms. Coleman"), JusticeWorks YouthCare visiting coach, and Ms. Reed, the former LCOCYS caseworker, now LCOCYS

program specialist. Mother, represented by counsel, was present in the courtroom and testified on her own behalf. Father failed to appear at the hearing, but was represented by counsel.

Prior to witness testimony, LCOCYS sought to move into evidence an exhibit packet, collectively identified as Petitioner's Exhibit 1 ("Exhibit P-1"), which contained court orders with attached findings of fact from prior permanency review hearings. Mother made an oral motion *in limine*, objecting only to the attached findings of fact from prior permanency review hearings. The orphans' court granted Mother's oral motion, precluding consideration of the attached findings of fact as part of Exhibit P-1.

By order dated March 2, 2016, the orphans' court *sua sponte* reconsidered its evidentiary ruling, and admitted the attached findings of fact from prior dependency hearings as part of Exhibit P-1. On March 9, 2016, the orphans' court conducted a pre-trial conference, informing counsel that they were permitted additional testimony and/or witnesses at the continued April 8, 2016 termination hearing.

At the April 8, 2016 hearing, Mother objected to the court's *sua sponte* admission and review of the findings of fact based on hearsay and the different standards of review and burdens of proof in dependency and termination hearings. The orphans' court denied Mother's request for reconsideration of its March 2 order, and offered all parties the opportunity to clarify or amplify the findings of fact, but the parties opted not to avail

4

themselves of the court's offer. At the conclusion of the hearing, the orphans' court directed all parties to file proposed findings of fact and legal memoranda. On October 6, 2016, the orphans' court entered a decree and an adjudication opinion, involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

On October 20, 2016, Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother raises the following issues:

> 1. Whether the trial court abused its discretion and committed an error of law by admitting and relying upon the findings of fact found in the dependency proceedings as competent evidence in the termination proceedings?
>
> 2. Whether the trial court abused its discretion and committed an error of law by terminating Mother's parental rights when such determination was not supported by clear and convincing evidence under 23 Pa.C.S. § 2511(a)(8)?
>
> 3. Whether the trial court abused its discretion by terminating Mother's parental rights in violation of 23 Pa.C.S. § 2511(b) by finding that such termination of parental rights will serve the developmental, physical and emotional needs and welfare of Child?

Mother's Brief, at 4.

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate

parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See id*., at 806. We have previously stated the standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *See In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (quoting *In re: N.C.*, 763 A.2d 913, 917 (Pa. Super. 2000)).

In her first issue for review, Mother contends that the orphans' court abused its discretion by admitting and relying upon findings of fact from prior juvenile dependency hearings, where different issues are being

6

reviewed and hearsay is routinely admitted. **See** Mother's Brief, at 9. Mother submits that the orphans' court's decision to terminate her parental rights must be vacated and remanded for further proceedings. **See id**., at 16. Our review of the record indicates that Mother objected, raising this issue before the orphans' court. **See** N.T., 4/8/16, at 4-9, 22-23. Accordingly, this issue framed as a challenge to the admissibility of the evidence is preserved for our review. **See** Pa.R.A.P. 302(a).

The question of whether to admit evidence is within the sound discretion of the trial court, and we review the decision under an abuse of discretion standard. **See A.J.B. v. M.P.B.**, 945 A.2d 744, 749 (Pa. Super. 2008). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." **Bulgarelli v. Bulgarelli**, 934 A.2d 107, 111 (Pa. Super. 2007) (citation omitted).

The basic requisite for the admission of any evidence is that it be both competent and relevant. Evidence is competent if it is material to the issues to be determined at trial and relevant if it tends to prove or disprove a material fact in issue. **See Turney Media Fuel, Inc. v. Toll Bros.**, 725 A.2d 836, 839 (Pa. Super. 1999).

Our Rules of Evidence define hearsay as a statement that

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801(c).

Further, we have explained, that

[a]s a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. Notably, it is elemental that, [a]n out of court statement which is not offered for its truth, but to explain the witness' course of conduct[,] is not hearsay.

*In re K.A.T.*, 69 A.3d 691, 702 (Pa. Super. 2013) (citations and quotations marks omitted).

Nevertheless, an error will be deemed harmless if:

(1) the error did not prejudice the defendant or the prejudice was *de minimus*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence . . . was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Markman*, 916 A.2d 586, 603 (Pa. 2007) (citations and quotation marks omitted).

Preliminarily, we note that the orphans' court did not discuss the admissibility of the factual findings from prior dependency matters in its adjudication opinion and did not file a subsequent opinion pursuant to

Pa.R.A.P. 1925(a). With regard to Mother's evidentiary challenge, the record evidences that, at the hearing on February 19, 2016, LCOCYS sought to admit court orders with attached findings of fact from prior permanency review hearings as part of Exhibit P-1. **See** N.T., 2/19/16, at 4. Because Mother only objected to the attached findings of fact, the court orders from prior permanency review hearings were admitted. By order dated March 2, 2016, the orphans' court *sua sponte* reversed its evidentiary ruling and admitted the attached findings of fact from prior dependency hearings. **See** Orphans' Court Order, 3/2/16, unnumbered page 1. The orphans' court conducted a pre-trial conference on March 9, 2016, informing counsel that they were permitted to litigate any prior issues or call additional witnesses to clarify the admitted findings of fact at the subsequent hearing on April 8, 2016.

At the April 8 hearing, Mother objected to the court's *sua sponte* admission and review of the findings of fact based on hearsay and the different standards of review and burdens of proof in dependency and termination hearings. **See** N.T., 4/8/16, at 20, 25-26. The orphans' court overruled Mother's objections to preclude it from reviewing the findings of fact, opining that the prior court orders contained legal conclusions regarding the parents' compliance with their FSP objectives, and referred to the attached factual findings as a way of explaining the conclusions. **See id**., at 24-25. The orphans' court found the attached findings of fact, explaining

the court orders concerning the parents' compliance with their FSP goals, relevant to its determination whether to terminate their parental rights to Child. *See id*., at 18. Because of its evidentiary ruling, the orphans' court offered all parties, including Mother, the opportunity to litigate any issues, and call or cross-examine witnesses regarding the admitted findings of fact. *See id*., at 25-26. While LCOCYS declined to call witnesses for additional questioning, LCOCYS made their witnesses available for Mother and Father to question them. *See id*., at 28. Mother, however, stated she did not wish to call or cross-examine any witnesses. *See id*., at 29.

Mother claims that the admitted findings of fact from prior dependency proceedings should not be used as competent evidence in a termination hearing because permanency review hearings pursuant to 42 Pa.C.S.A. § 6351 and termination hearings pursuant to 23 Pa.C.S.A. § 2511 are wholly distinct and separate, and issues decided at each hearing are uniquely different. *See* Mother's Brief, at 9. Although Mother cites to § 6351 and § 2511, she fails to explain how the language of either statute supports her assertion that the admitted findings of fact from prior permanency review hearings have no relevance and are precluded in a termination hearing. Additionally, we note that Mother only objected to the findings of fact attached to court orders, and not to the actual court orders from prior dependency hearings. Mother offers no pertinent statutory explanation or case citation that discusses the effect of admitting the findings of fact from

prior dependency proceedings in a termination hearing. Likewise, Mother's brief also does not contain meaningful discussion of or citation to relevant legal authority that distinguishes between the admissibility of findings of fact from prior dependency proceedings and court orders containing legal conclusions from prior dependency proceedings.

Mother also challenges the admission of findings of fact based on hearsay. Mother argues that the orphans' court admitted and cited to the factual findings, which may be based on hearsay, thereby violating her right to confront witnesses and litigate any issues from prior dependency proceedings. *See id*., at 15-16. Mother does not indicate conclusively which of the factual findings from prior dependency hearings are actually derived from hearsay statements, nor does she refer us to any relevant authority, which would preclude the admission of these factual findings into evidence. As such, we will not reverse the evidentiary ruling order based on Mother's unsupported allegations and speculation. Furthermore, the record clearly reflects that the orphans' court offered all parties, including Mother, the opportunity to call or cross-examine witnesses and litigate prior issues regarding its *sua sponte* ruling to admit the attached findings of fact, and Mother declined the court's offer. Accordingly, the orphans court did not violate her right to confront and cross examine witnesses and litigate prior issues when it *sua sponte* admitted the factual findings from prior dependency hearings.

11

Upon review of the record and Mother's arguments, we reject Mother's claim that the orphans' court relied upon inadmissible evidence to terminate her parental rights. Assuming *arguendo*, that the orphans' court did admit inadmissible evidence, any error in admitting and relying upon this evidence must be deemed harmless when viewed in the context of the entire record, as the factual findings were merely cumulative of the prior court orders admitted without objection and the uncontroverted testimonial evidence presented by LCOCYS.

We next address whether the orphans' court abused its discretion by terminating Mother's parental rights. In terminating Mother's parental rights, the orphans' court relied upon § 2511(a)(8) and (b) of the Adoption Act, which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8) and (b).

This Court has stated that

[i]n order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re I.E.P.*, 87 A.3d at 356 (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa. Super. 2003); 23 Pa.C.S. § 2511(a)(8)).

"Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. *See id*. Termination under § 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of CYS services. *See In re Adoption of T.B.B.,* 835 A.2d 387, 396 (Pa. Super. 2003); *In re Adoption of M.E.P.,*

13

825 A.2d at 1275-1276. The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (citations omitted). Furthermore, we have acknowledged that

> the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.E.P.*, 87 A.3d at 345–346 (quoting *In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013)).

With respect to the "needs and welfare" analysis pertinent to § 2511(a)(8) and (b), we have observed that

> initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section

> 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of the child, as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re I.E.P.*, 87 A.3d at 346 (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted)).

Mother argues that the orphans' court abused its discretion and committed an error of law by terminating her parental rights when such determinations are not supported by clear and convincing evidence under § 2511(a)(8). *See* Mother's Brief, at 16. Mother specifically challenges the second and third elements of § 2511(a)(8), claiming the evidence presented does not support a finding that Mother is unable or unwilling to remedy the conditions which led to Child's placement or that termination meets the needs and welfare of Child. *See id*., at 17. We disagree.

It is undisputed that the first element of § 2511(a)(8) has been met. On April 12, 2013, LCOCYS obtained an Emergency Protective Order and placed Child into foster care on April 13, 2013, where she has resided for approximately her entire life. *See* N.T., 2/19/16, at 90. Accordingly, Child had been out of Mother's care for a period in excess of 12 months at the time of the termination hearing on February 19, 2016.

We now examine the second factor of § 2511(a)(8), *i.e.,* whether the conditions that led to Child's placement continue to exist, whereby Mother

claims the record is devoid of any evidence she has not remedied the conditions that led to Child's placement. The record discloses that Child was removed from Mother's care by LCOCYS due to her refusal to cooperate with the safety plan devised for Child and her history of noncompliance regarding her three older children. *See id*., at 89.

Contrary to Mother's assertion, the orphans' court opined that

[t]he issues that led to [C]hild's removal were well-founded concerns that Mother would not cooperate with [LCOCYS], would not maintain open communication, and would not provide for [Child's] needs, including medical care. Specific court [o]rders designed to lead to reunification required Mother to maintain legal income and stable housing, cooperate with LCOCYS and all other recommended services, cooperate with in-home services, complete a mental health evaluation and comply with recommendations, and comply with medical treatment and services for [Child]. Mother did not make substantial progress with any of these goals.

Of all the court-ordered services, the only one with which Mother has arguably complied [with] is the requirement to maintain legal income in that she has had long-standing part-time employment at a Giant food store. In the three years [C]hild has been in care, [LCOCYS] and in-home service providers saw little to no progress in Mother's parenting, her attachment to [Child], her ability to meet [C]hild's needs for love and affection, her understanding of [C]hild's medical needs, or her participation in [C]hild's medical care. She has attended only four of [C]hild's numerous medical appointments over the course of nearly three years and still has a very limited understanding of [Child's] medical issues. Mother has never had stable, independent housing or completed the court-ordered mental health evaluation. For three years, [LCOCYS] has been trying to work with Mother on the same goals regarding [C]hild [which have] been in place prior to [Child's] birth for the other three children. Mother has made virtually no progress.

With respect to [C]hild's need for love and affection, Mother's own account of the most recent few visits is that she started and ended the visit by hugging [Child]. She testified that she would ask her [about] her week and tell [Child] that she misses and loves her. Even if Mother's rendition is accurate, we note that during much of the pendency of the matter, Mother had to be encouraged to greet her daughter. To this day, Mother spends much of the visit preoccupied with texting, and there are times she detaches and shuts down during visits. Just a few months before the February 2016 termination hearing, concerns were raised that Mother had shown notable regression in her parenting, becoming verbally aggressive with her daughter and threatening not to give her any Christmas presents.

The same concerns that led to [C]hild's adjudication still exist today; namely, Mother's capacity to parent [C]hild safely and appropriately, to provide for her need for love and affection, and to address her medical needs. Unfortunately, Mother's progress was so poor that in the three years [LOCCYS] has provided services to try to help Mother reunify with [Child], Mother has never even progressed to an unsupervised visit. The progress she made in the area of meeting [C]hild's most basic needs is diminished by her lack of flexibility and spontaneity in parenting. She brings the same meal to every visit, reads the same book, and gets frustrated with [Child's] normal toddler behavior. Nothing in the record indicates that more time or more services will help Mother reunify with [C]hild.

Orphans' Court Adjudication Opinion, 10/6/16, at 8 (citations omitted).

Our review of the record finds that there is ample testimony in the record from which the orphans' court appropriately concluded that the conditions that led to Child's placement continue to exist. Ms. Reed, a former LCOCYS caseworker, testified that she worked with family from June 2011 until October 2015. *See* N.T., 2/19/16, at 83. Ms. Reed provided the orphans' court with the history concerning the termination of Mother's parental rights with respect to her three oldest children, and the safety

concerns leading to Child's placement into foster care, where she currently resides. *See id*., at 84-90; 138. Ms. Reed testified to Mother's court-ordered FSP goals for reunification with Child. *See id*., at 91.

She stated that Mother has always maintained employment by working as a cashier at Giant. *See id*., at 131. Ms. Reed testified that Mother failed to obtain independent housing even though LCOCYS provided her with services to assist her in meeting this goal. *See id*., at 98. Throughout the case, Mother has relied on others, such as Father, Maternal Grandmother and her current boyfriend, to provide housing. *See id*., at 131-132, 148-149. Ms. Reed also stated that Mother adamantly refused to complete a mental health evaluation, which would have been helpful to LCOCYS in offering Mother appropriate services to try to reunify her with Child. *See id*., at 114-115.

Ms. Reed informed the court that Child was diagnosed with microcephaly, where the circumference of Child's head wasn't growing at a normal rate. *See id*., at 105-106. Ms. Reed opined that Mother has very limited understanding of Child's medical issues and did not make the effort to participate in the medical and developmental interventions. *See id*., at 119-120. Ms. Reed testified that Mother was given the opportunity to attend Child's medical appointments with transportation provided, but only attended three out of the eighteen pediatric appointments and one neurologist appointment. *See id*., at 120.

Ms. Reed further testified that Mother struggled with any in-home services that LCOCYS provided for her due to her inability to be receptive to their parenting suggestions. *See id*., at 118. Based on Ms. Reed's observations of Mother's supervised visits, she opined that Mother also struggled with connecting and engaging with Child. She noted that when Child was an infant, Mother appeared detached, avoiding eye contact and not interacting verbally or physically with Child unless directed to do otherwise. *See id*.,at 112-114. As Child grew older, Mother's ability to parent, connect and care for Child did not improve. *See id*., at 119. Ms. Reed described Mother as hot and cold, stating there would be times when she barely acknowledged that Child was there. *See id*., at 123-124.

Ms. Reed opined that from June 2011 until October 2015, Mother has continuously worked on the same goals that were previously court-ordered of her pertaining to her three older children without making any significant progress. *See id*., at 119. Ms. Reed further testified that Mother has been given excessive resources to try to rectify the circumstances that led Child into placement, but there has not been any progress where she would suggest Mother have unsupervised visits, and does not think circumstances leading Child into placement would improve if given more time. *See id*., at 147.

Likewise, Ms. Coleman, a visiting coach from Justice Works YouthCare, testified that she started working with Mother and Child in May 2014, and

continued to work with Mother and Child for two and a half years. *See id*., at 22, 44, 81. Ms. Coleman stated that during the visits, Mother was to work on: (1) assisting Child with meeting her developmental milestones; (2) providing for Child's basic needs such as food, beverages and diapers; and (3) satisfying Child's need for love and affection. *See id*., at 23. Ms. Coleman's duty as the visiting coach was to help Mother meet these goals during her visits with Child. *See id*., at 21-22.

Ms. Coleman testified that she and Mother were to meet for weekly pre-visit sessions and post-visit sessions to discuss expectations for the upcoming visit and evaluate the last visit. *See id*., at 25-29. Mother sporadically attended both sessions until November 2015, when she completely stopped going to either session. *See id*., at 24-25. For two and a half years, Ms. Coleman offered Mother suggestions on how she could improve her bond with Child, but Mother would almost never demonstrate or implement any of these suggestion except for a brief period of a month and a half when she showed improvement. *See id*., at 31. Ms. Coleman stated that for two and a half years, Mother spent a significant portion of the visit texting on her cellphone rather than interacting with Child. *See id*., at 37.

Ms. Coleman stated that when Child started walking, she was concerned for her safety because Mother would not assist her unless otherwise directed to do so. *See id*., at 40. Ms. Coleman noted that Mother did consistently provide for Child's necessities by bringing food, beverages,

diapers, and wipes. *See id*., at 32-33. Despite her suggestions for different activities and food choices, Mother usually brought the same meal, microwaved Gerber's macaroni and cheese, and read the same book to Child. *See id*., at 33. She noted that Mother would get easily frustrated when Child would not respond in a manner she hoped for, such as crying when she would attempt to feed her. *See id*., at 76. Ms. Coleman testified that, while Mother and Child had positive interactions, Mother's relationship with Child remained the same and there was no significant progress since she started as the visiting coach in May of 2014. *See id*., at 49.

Thus, the testimonial evidence of record compels the conclusion that the conditions that had led to the removal of Child continued to exist at the time of the termination hearing, satisfying the second element of § 2511(a)(8).

Finally, with regard to the third prong of § 2511(a)(8), Mother contends that there is no evidence that termination would best serve the needs and welfare of Child. *See* Mother's Brief, at 17. Mother argues that she can and has demonstrated her ability to meet Child's needs and provide essential care for Child. *See id*., at 18.

The orphans' court, however, concluded that Mother did not seem to grasp the importance of meeting Child's developmental milestones and was dismissive about her medical needs. *See* Orphans' Court Adjudication Opinion, 10/6/16, at 14. The orphans' court opined that Mother has made

little progress in bonding with Child and showing her love and affection. *See id*., at 16. The orphans' court found Mother's relationship with Child has not changed or improved during the course of the proceedings. *See id*., at 23. After carefully considering the tangible dimensions as well as the intangible dimensions – the love, comfort, security and permanency – entailed in a parent-child relationship, the orphans' court concluded Child is receiving love, comfort, security, and safety from her foster parents, and that staying with foster parents would best serve Child's needs and welfare. *See id*., 23-24.

The record reveals that Mother has not made progress with all of her FSP objectives. She has not obtained independent housing, completed a mental health evaluation or cooperated with in-home services and LCOCYS since Child's removal. Most importantly, her failure to appreciate Child's medical, emotional, safety and developmental needs impairs her ability to parent Child. As such, the conditions that led to removal continue to exist, and Mother has done nothing to meet the needs and welfare of Child.

We find the orphans' court appropriately concluded that terminating Mother's parental rights would best serve Child's needs and wellbeing because it would permit her to enjoy a childhood with her foster parents that have cared for her since birth. We also find that the credibility and weight determinations by the orphans' court are supported by competent evidence in the record. The record supports the orphans' court's determination that

the statutory elements for termination under § 2511(a)(8) were proven by clear and convincing evidence to involuntarily terminate Mother's parental rights.

We next consider whether the orphans' court erred by terminating Mother's parental rights under § 2511(b). With respect to that subsection, this Court has explained the requisite analysis as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762–[7]63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at [7]63.

*In re I.E.P.*, 87 A.3d at 346 (quoting *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010)). Moreover, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re I.E.P.*, 87 A.3d at 347–348 (quoting *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010)) (internal citations omitted).

23

Herein, Mother contends that the orphans' court abused its discretion and committed an error of law in holding that termination would serve the best interest of Child pursuant to § 2511(b). *See* Mother's Brief, at 19. Mother claims that she has developed a bond with Child worth saving, and is able to care for Child by meeting her developmental, physical and emotional needs. *See id.*, at 20-21.

With regard to § 2511(b), Ms. Coleman testified that Mother's relationship with Child appears to be more of an aunt and niece bond. *See* N.T. 2/19/16 at 70. Ms. Coleman stated that Child enjoys seeing Mother, but her attachment to Mother is similar to the attachment Child has with her. § *See id.*, at 70-71. Ms. Coleman stated that when Mother ignores Child during their visits, it has no effect on Child and Child happily plays by herself. *See id.*, at 71.

Additionally, Ms. Reed testified that Child's foster home is the only home Child has known since she was discharged from the hospital. *See id.*, at 147. Ms. Reed stated that Child looks to foster mother with care and turns to foster mother for comfort. *See id.*, at 146. Ms. Reed testified that foster mother has met all of Child's daily needs for the past three years as foster mother takes her to the doctor, cares for Child when she is sick, and provides Child with a loving family home. *See id.*, at 146-147. Ms. Reed opined that she does not think Mother would be able to care for Child safely. *See id.*, at 147. Ms. Reed stated that Child's attachment to Mother is similar

to the attachment of a well-liked teacher. *See id*., at 148. Ms. Reed opined that Child will not be harmed if Mother's parental rights were terminated due to her need for permanency and stability. *See id*.

The orphans' court found that foster parents have been caring for Child since birth, and are the only real parents Child has ever known. *See* Orphans' Court Adjudication Opinion, 10/6/16, at 24. The orphans' court opined that Child has a strong, secure attachment to her foster parents, and Child turns to them for affection and comfort. *See id*. The orphans' court further found that foster parents care for all her needs, including providing day-to-day care and appropriately managing her medical conditions. *See id*. As such, the orphans' court determined that terminating Mother's parental rights would have no significant effect on Child. *See id*. The orphans' court concluded that it is in the best interest of Child to terminate Mother's parental rights so that Child may attain permanency in a loving and stable home. *See id*., at 24-25.

We have explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *See In re Z.P.*, 994 A.2d at 1121. "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal

citations omitted). "[W]e will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

After a careful review of the record in this matter, we find the record supports the orphans' court's factual findings, and the orphans' court's conclusions are not the result of an error of law or an abuse of discretion. Accordingly, it was proper for the orphans' court to find no bond exists such that Child would suffer permanent emotional harm if Mother's parental rights were terminated. We, therefore, affirm the decree, terminating Mother's parental rights with regard to Child under § 2511(a)(8) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/25/2017

26