**[J-37-2018] [MO: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 745 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on April 27, 2017 in |
| | : | the Court of Common Pleas, Pike |
| v. | : | County, Criminal Division at No. CP- |
| | : | 52-CR-0000019-2015. |
| | : | |
| ERIC MATTHEW FREIN, | : | ARGUED:  May 17, 2018 |
| | : | |
| Appellant | : | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE WECHT**                                        **DECIDED:  April 26, 2019**

I join the learned Majority's fine opinion in all respects, save for Part III, and save for the Majority's ultimate disposition denying Eric Frein a new penalty phase hearing.

Relying principally upon the general presumption that jurors follow a trial judge's instructions, the Majority in Part III rejects Frein's claim that the victim impact evidence presented to the jury violated his constitutional right to due process of law.[1] The overwhelming victim impact evidence in this case—some of which was not victim impact evidence at all—exceeded constitutionally permissible limits.  In view of the trial court's error in this regard, this Court is bound as a matter of constitutional law to vacate Frein's death sentence and to remand the case to the trial court for a new penalty phase.  Thus, as to Part III and the Court's decision not to afford Frein a new sentencing hearing, I respectfully dissent.

*                *                *

---

[1]      *See* Maj. Op. at 35-36.

Before delving into the issue of victim impact evidence, I am obliged to address the viability of Frein's contention that Pennsylvania State Police ("PSP") personnel violated his constitutional rights when they failed to inform him, before he waived his *Miranda*[2] rights, either: (1) that his parents had retained an attorney to assist him after he was apprehended; or (2) that this attorney arrived at the PSP barracks during the initial stages of the interrogation and was nonetheless prevented from accessing him. The Majority appropriately declines to address this claim in light of its resolution of Frein's other suppression issue. *See id.* at 31 ("[A]ny error by the trial court in refusing to suppress Appellant's statement was harmless in light of the overwhelming, properly admitted, evidence establishing Appellant's guilt.").

I join this aspect of the opinion. Principles of judicial restraint counsel that, in the ordinary course, this Court should not decide that which is not necessary to resolve a case. The prudential choice not to address the *Miranda* issue here should not be construed as any holding concerning the substantive viability of a similar challenge in future cases, nor as an endorsement of the actions undertaken by PSP personnel in this case. Those actions, which I detail immediately below, raise troubling and significant constitutional concerns that are not fully resolved or foreclosed by precedents of the Supreme Court of the United States or this Court.

On October 30, 2014, Frein's parents watched local television news coverage of Frein's arrest for the murder of PSP Corporal Bryon K. Dickson. When Frein appeared on the television screen, his parents noticed that he had sustained facial injuries. Concerned about both Frein's well-being and his legal rights, Frein's parents contacted Attorney James Swetz. Frein's parents retained Attorney Swetz and asked him to go to the PSP barracks where Frein was being held, in order to assess Frein's physical

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

condition, to invoke Frein's right to counsel, and to discuss with Frein his right to remain silent.

At 8:48 p.m., Attorney Swetz phoned PSP dispatch and told the dispatcher that he was hired by Frein's family and that he intended to go to the barracks to intervene before PSP personnel began to interrogate Frein. The dispatcher responded by providing Attorney Swetz a relevant telephone number.

Attorney Swetz dialed that telephone number. A PSP trooper answered the call and told Attorney Swetz that he would not be granted entry into the barracks, that Frein was an adult who could make his own decisions, and that, up to that point in time, Frein had not requested a lawyer. Attorney Swetz replied emphatically, telling the trooper that he was invoking Frein's right to counsel, an invocation that he believed would serve to terminate or forestall the interrogation. The trooper responded by repeating that, if Attorney Swetz showed up at the barracks, he would not be permitted to enter the premises, let alone to see Frein.

Despite the warning, Attorney Swetz drove to the PSP barracks. While en route, Attorney Swetz received a call from someone at the barracks inquiring as to the time that he expected to arrive, as well as the make and model of his vehicle. When Attorney Swetz arrived, he encountered a multitude of PSP troopers, some in camouflage, standing outside of the barracks. Attorney Swetz approached the troopers and tried to explain that he was there to invoke Frein's *Miranda* rights. He again was told that he was not permitted to enter the building. He was directed to a parking spot on the side of the road.

While parked, Attorney Swetz attempted to reach Pike County District Attorney Ray Tonkin by telephone. A dispatcher answered the call and took Attorney Swetz' cell phone number. Minutes later, two plainclothes troopers approached Attorney Swetz in

his car and told him that District Attorney Tonkin would return his call shortly. While Attorney Swetz waited, he telephoned Frein's father, who told Attorney Swetz that television news was covering a live press conference, at which it was being reported that Frein was not represented by counsel. At that point, Attorney Swetz became convinced that he was not going to be allowed into the barracks, so he drove home.

At 1:13 a.m., District Attorney Tonkin returned Attorney Swetz' earlier call. The purpose of the call was to inform Attorney Swetz that Frein was scheduled for an arraignment later that morning. District Attorney Tonkin also told Attorney Swetz that the Commonwealth would file a motion to move the arraignment from a local magisterial district judge's office to the Pike County Courthouse. Attorney Swetz informed District Attorney Tonkin that, due to a previously scheduled court appearance in another county, he would not be able to attend the arraignment. Attorney Swetz did not appear at the arraignment. Notably, however, in the Commonwealth's motion to change the venue of the preliminary arraignment, District Attorney Tonkin listed Attorney Swetz as Frein's counsel of record.

At no point did anyone tell Frein that his parents had retained Attorney Swetz to represent him during the interrogation, or that Attorney Swetz was present at the PSP barracks for that purpose. As well, no one told Corporal Clark, Trooper Mulvey, or ATF Agent Dressler, all of whom were involved in the interrogation of Frein, that Attorney Swetz was at the barracks or that Swetz had attempted to invoke Frein's right to counsel. Presently, Frein argues that, by failing to inform him of Attorney Swetz' presence at the barracks, and by preventing Swetz from accessing him, the Commonwealth and its agents violated Frein's Fifth, Sixth, and Fourteenth Amendment rights, as well as his rights under Article I, Section 9 of the Pennsylvania Constitution.

In *Moran v. Burbine*, 475 U.S. 412 (1986),[3] the Supreme Court of the United States held that similar actions by police officers did not offend either the Fifth or Sixth Amendments to the United States Constitution. Shortly after Burbine was arrested in Cranston, Rhode Island in connection with a burglary, police officers discovered information connecting him to a murder that occurred in Providence, Rhode Island. The arresting officers contacted officers from Providence and informed them of both their suspicion that Burbine had committed the murder and the fact that Burbine was in police custody. *Id.* at 416. Three Providence police officers drove to where Burbine was being held, intent upon interrogating him about the murder. *Id.*

In the meantime, Burbine's sister, who was aware only of the burglary arrest, contacted the local public defender's office and sought legal representation for her brother. An attorney from that office called the police station in Cranston where Burbine was being detained and asked to talk with a detective. *Id.* at 417. When an unidentified

---

[3] A brief note is in order regarding the short form of citation that I use when I refer to *Moran v. Burbine*, 475 U.S. 412 (1986). According to *The Bluebook*, when using a short form citation, one should "avoid using the name of a geographical or government unit, a government official, or a common litigant." THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 10.9(a)(i), at 116 (Columbia Law Rev. Ass'n et al. eds., 20th ed. 2015). At the time *Moran v. Burbine* was decided, John Moran was the Superintendent of the Rhode Island Department of Corrections, *i.e.*, a government official and, likely, a common litigant. Thus, in compliance with standard *Bluebook* format, when using the short form citation, I use "*Burbine*" rather than "*Moran*."

I note nonetheless that, with regard to *Moran v. Burbine*, courts generally have not opted to cite the case as "*Burbine*." For instance, in *Commonwealth v. Arroyo*, 723 A.2d 162 (Pa. 1999), this Court elected to use "*Moran*" in its short form references to the case. Similarly, in several instances, Justices of the Supreme Court of the United States also referred to the case in short form as "*Moran*." *See*, *e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 791 (2009); *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 207 (2008); *Missouri v. Seibert*, 542 U.S. 600, 625 (2004) (O'Connor, J., dissenting); *McNeil v. Wisconsin*, 501 U.S. 171, 181 (1991). However, in *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010), Justice Kennedy, writing for the majority, elected to use "*Burbine*" as the title for the short form citation. Like the *Berghuis* Court, I use "*Burbine*," as that usage aligns most closely with the applicable *Bluebook* rule.

person answered, the attorney stated, among other things, that she would be acting as Burbine's attorney in the event that the police interrogated Burbine or placed him in a lineup. The unidentified person told the attorney that the police would neither interrogate Burbine that night, nor put him in a lineup. The person indicated that police officers had ceased their interactions with Burbine for the night. The person neither informed the attorney that Burbine was a suspect in a murder, nor that the Providence police had arrived in Cranston to interrogate Burbine about that murder. Burbine was not informed that his sister had arranged representation, nor that the attorney had contacted the police on his behalf. *Id.*

Despite the representations made to the public defender, the Providence police conducted a series of interviews with Burbine regarding the murder. Before each interview, the police provided Burbine with *Miranda* warnings. Each time, Burbine waived his constitutional rights by executing a written *Miranda* waiver form. At no point did Burbine change his mind, revoke his waiver, or ask for an attorney. *Id.* at 417-18. Burbine confessed to the murder in three written statements, and he was charged accordingly. Before trial, he moved to suppress the statements on the basis that the police officers' actions violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel. The case made its way to the United States Supreme Court, which granted *certiorari* to decide "whether a prearraignment confession preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him." *Id.* at 420.

The Supreme Court rejected both of Burbine's primary constitutional claims. Regarding the Fifth Amendment privilege against self-incrimination, the Court first explained that nothing about the actual *Miranda* waiver rendered it invalid. Burbine was

not subjected to deceptive or psychological pressures, nor was there any evidence of record to suggest that Burbine did not comprehend his rights or the impact of his decision to relinquish them. The Court then held that an otherwise valid waiver of one's *Miranda* rights is not invalidated by forces unknown to the person in custody. "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. The Court acknowledged that "additional information would have been useful" to Burbine, but the Court had "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* In short, once it is established that the suspect knew, understood, and waived his applicable rights, including the prerogative to stop the interrogation by invoking one of those rights, "the [Fifth Amendment] analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-43.

The Supreme Court also rejected Burbine's Sixth Amendment challenge. The Court noted first that the right to counsel included within the *Miranda* warnings is not a substantive constitutional right, but instead is a procedural device created to provide an extra level of protection over a suspect's Fifth Amendment privilege against self-incrimination. *Id.* at 429. The substantive Sixth Amendment right has no application at the investigative/interrogative stage of the criminal process. The right does not attach until the government's role shifts from "investigation to accusation." *Id.* at 430. Because Burbine's three confessions occurred prior to the initiation of formal criminal proceedings, the Court found no Sixth Amendment right to be violated. *Id.* at 432.

Although it foreclosed Burbine's claims based upon the Fifth and Sixth Amendments, the Court nonetheless acknowledged two other potential avenues for relief in such circumstances: (1) the Due Process Clause of the Fourteenth Amendment; and

(2) decisions premised exclusively upon state constitutional law. *Id.* at 428, 432-33. The Court briefly considered whether Burbine's due process rights were violated, but held that the specific facts of the case fell "short of the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Id.* at 433-34. The Court expressly left open the possibility that "on facts more egregious than those presented here police deception might rise to the level of a due process violation." *Id.* at 433.

A number of state supreme courts have accepted the *Burbine* Court's invitation to reconsider the issue as a matter of state constitutional law, with some concluding that such deceptive police behavior violates their respective state constitutions. *See, e.g., State v. Reed*, 627 A.2d 630, 646 (N.J. 1993) (holding that "the failure of the police to inform defendant that an attorney was present and asking to speak with him violated defendant's State privilege against self-incrimination"); *State v. Stoddard*, 537 A.2d 446, 451-55 (Conn. 1988) (holding that the Due Process Clause of the Connecticut Constitution imposes a duty upon police officers to act reasonably, diligently, and promptly to inform a suspect that an attorney presently is making efforts to offer legal assistance).

Our Court has addressed the question only once, in *Commonwealth v. Arroyo*, 723 A.2d 162 (Pa. 1999). There, we did not resolve the issue in a manner that would preclude a future challenge. Quite the opposite. In *Arroyo*, police officers interviewed Arroyo regarding his suspected role in the death of his eight-month-old son. *Id.* at 164. The police provided Arroyo with a standard *Miranda* warnings form, which Arroyo understood and signed. Arroyo eventually admitted to punching his son in the chest and stomach several times. During the interrogation, an attorney retained by Arroyo's girlfriend called the police station and asked to speak with Arroyo, seeking specifically to ask Arroyo

whether he desired the attorney's assistance during questioning. The police refused to put the attorney in contact with Arroyo and never informed Arroyo that the attorney had attempted to contact him. *Id.*

Arroyo challenged the police conduct under the Pennsylvania Constitution, asserting violations of his right against self-incrimination, his right to due process, and his right to counsel. Ultimately, this Court only addressed substantively (and extensively) Arroyo's right to counsel claim, holding that Pennsylvania's Article I, Section 9 right to counsel is coterminous with the Sixth Amendment right to counsel, and, therefore, provides no greater protection at the investigative/interrogatory stage of the criminal process. *Id.* at 170.

Arroyo's remaining constitutional claims did not receive detailed, substantive treatment. Rather, this Court rejected both claims essentially on procedural grounds. As to self-incrimination, this Court observed that Arroyo "pa[id] scant attention" to this argument in his brief. *Id.* at 166. This Court then criticized Arroyo for "utterly fail[ing] to take cognizance of the fact that this [C]ourt has repeatedly stated that . . . the provision in Article I, § 9 which grants a privilege against self-incrimination tracks the protection afforded under the Fifth Amendment." *Id.* Essentially, this Court dismissed Arroyo's self-incrimination argument as substantively undeveloped, and for failing to provide an analysis under *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), that might support any effort to distinguish our Constitution from its federal counterpart. Lacking such advocacy, this Court declined to deviate from the existing parallel jurisprudence under the United States Constitution. *Arroyo*, 723 A.2d at 167.

Arroyo's due process challenge met a similar fate. This Court explained that Arroyo's "references to a due process violation are hopelessly intertwined with his

argument that his right to counsel was denied." *Id.* Accordingly, this Court refused to "separate it out and, in effect, raise an issue for him *sua sponte.*" *Id.*

In the two decades since *Arroyo*, we have not had an opportunity to address substantively the questions that our decision left open. As I read *Arroyo*, this Court did not resolve with precedential finality whether the police action (or inaction) at issue in this line of cases violates a suspect's Pennsylvania constitutional privilege against self-incrimination. To be sure, the question superficially is governed by the general parallelism heretofore recognized between the applicable state and federal constitutional provisions. However, the coterminous nature of these provisions remains susceptible to a comprehensive *Edmunds* analysis, one that the *Arroyo* Court did not engage in substantively due to Arroyo's briefing inadequacies. Unless and until this Court undertakes an *Edmunds* review, I view the issue as ripe for reconsideration, particularly in light of *Burbine*'s invitation to state courts to consider the issue under the independent protections afforded by state constitutions.

Similarly, due process remains a viable avenue to test the constitutionality of this type of police conduct. We resolved Arroyo's due process claim with no more finality than his self-incrimination challenge, as Arroyo did not develop the claim in a meaningful way that would permit this Court to address it substantively. Additionally, in *Burbine*, the United States Supreme Court rejected a federal due process challenge only as to the facts of that case, and expressly left open the possibility that other facts could give rise to such a challenge. *Burbine*, 475 U.S. at 432-33.

From my perspective, a due process challenge could be particularly compelling. We have in the past explained that "[t]he due process inquiry, in its most general form, entails an assessment as to whether the challenged proceeding or conduct offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked

as fundamental and that defines the community's sense of fair play and decency." *Commonwealth v. Kratsas*, 764 A.2d 20, 27 (Pa. 2001) (internal citations and alterations omitted). "Substantive due process is the esoteric concept interwoven within our judicial framework to guarantee fundamental fairness and substantial justice[.]" *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004) (internal citation omitted).

*Miranda* warnings are not mandated by the text of any of the amendments contained in the Bill of Rights. Nonetheless, in *Dickerson v. United States*, 530 U.S. 428 (2000), the Supreme Court recognized that "*Miranda* announced a constitutional rule." *Id.* at 444. A primary purpose of that rule is "to [e]nsure that the [suspect's] right against compulsory self-incrimination is protected." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (internal citation omitted). "The purpose of the *Miranda* warnings [] is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights." *Burbine*, 475 U.S. at 425. One way in which the warnings attempt to mitigate the coercive atmosphere of police interrogation is by clearly informing the suspect that he or she has the right to an attorney to assist in the decision of whether to surrender the right not to incriminate himself or herself. Another is by permitting the suspect to stop the interrogation at any time to invoke the right to silence or to speak with an attorney.

It is difficult to square the right to counsel as afforded by *Miranda*, and the fundamental fairness required by due process, with the actions undertaken by PSP personnel in this case. It strikes me as starkly ironic that a suspect is (and must be) informed that he may have an attorney to help him make the decision of whether to cooperate with the police, yet need not be told that in fact an attorney has arrived on the premises seeking to do exactly that. Irony aside, a substantial question remains as to whether what happened at the PSP barracks in this case comports with any conception

of fundamental fairness, let alone the robust one heretofore recognized in Pennsylvania. *See generally, Commonwealth v. Brown*, 52 A.3d 1139, 1162 (Pa. 2012).

Here, Frein was informed that he had the right to consult an attorney before waiving his constitutional rights. What he did not know was that Attorney Swetz was at the barracks ready and willing to assist him but was prohibited from going inside the building. Before Frein waived his rights, no one told him that, although District Attorney Tonkin would recognize Attorney Swetz as Frein's counsel of record, agents of this Commonwealth would not allow that lawyer actually to fulfill the function envisioned for counsel in *Miranda*. Frein was advised that he could stop the interrogation at any time, but he did not know that, if he did so, there was an attorney on the premises, hired by his parents, ready and waiting to advise him. Due process mandates adherence to fair play and decency. I find it quite difficult to believe that, under paradigms of criminal justice prevailing today, the police conduct surrounding Attorney Swetz and Frein's interrogation can be reconciled with substantive norms of fair play and decency. What the PSP personnel did in this case was actively prevent Frein from receiving that to which he constitutionally was entitled. There is nothing fair about that. The ends do not justify the means.

As I noted at the outset, the Majority declines to address these claims due to the posture of this particular case, and I join the Court's opinion in that regard. Nonetheless, I note that a challenge to such law enforcement tactics remains viable under the Pennsylvania Constitution. Neither *Burbine* nor *Arroyo* permanently foreclosed judicial review of such conduct. At the very least, five decades after *Miranda*, police action that prevents an attorney from accessing a client, particularly during the inherently coercive process of a custodial interrogation, should be consistently discouraged as a matter of law enforcement practice, even apart from the dubious constitutionality of such conduct.

\* \* \*

I return now to Frein's challenge to the quantity and nature of the victim impact evidence proffered by the Commonwealth during the penalty phase of this case. Frein acknowledges that the Commonwealth's presentation began with "traditional victim impact" evidence, but asserts that it "soon crossed the line and developed into emotionally charged, cumulative, and much more prejudicial than probative" evidence, violating his constitutional right to "fairness and due process." Brief for Frein at 39. Presumably anticipating the application of the general presumption that a jury follows a trial court's instructions, Frein argues that "[e]xceptions to the assumption that juries hear and follow instructions do exist[,]" particularly when the evidence at issue is so "overpowering, emotional, [and] highly prejudicial" that the "practical and human limitations of the jury system cannot be ignored." *Id.* at 42. Frein insists that this is in fact such a case, one in which the presumption must yield to the unavoidable effect of the victim impact evidence. After close review, I am constrained to agree.

"Pennsylvania jurisprudence favors the introduction of all relevant evidence during a capital sentencing proceeding[.]" *Commonwealth v. Eichinger*, 915 A.2d 1122, 1139 (Pa. 2007). This includes victim impact evidence. Victim impact evidence technically is irrelevant to any of the aggravating factors that the Commonwealth may seek to prove in support of a death sentence. *See Commonwealth v. Rios*, 920 A.2d 790, 807 (Pa. 2007), *overruled on other grounds by Commonwealth v. Tharp*, 101 A.3d 736 (Pa. 2014); 42 Pa.C.S. § 9711(d)(1-18). Nonetheless, courts have determined that the evidence is admissible at the penalty phase in capital cases, in part, to enable the jury to know and understand the "victim's uniqueness as an individual human being." *Payne v. Tennessee*, 501 U.S. 808, 823 (1991); *Commonwealth v. Flor*, 998 A.2d 606, 633 (Pa. 2010).

Victim impact testimony often is raw and heartrending. It can stir passions in a way that is not generally permitted for a jury's consideration in our system of criminal justice due to the potential that the emotional impact of such testimony either can prejudice the jury or distract it from the issues that must be resolved in the particular case. Nevertheless, at the sentencing phase of a capital case, "a criminal defendant does not have the right to have all evidence presented against him at trial sanitized of anything that could cause jurors to sympathize with the victim or his family." *Rios*, 920 A.2d at 807. "Testimony that is a personal account describing the devastating impact the murders had on the surviving families is wholly appropriate and admissible at the sentencing phase of a capital case." *Commonwealth v. Baumhammers*, 960 A.2d 59, 93 (Pa. 2008) (internal citation omitted).

Victim impact evidence is defined by statute as "evidence concerning the victim and the impact that the death of the victim has had on the family[.]" 42 Pa.C.S. § 9711(a)(2). By its terms, the statute establishes two categories of evidence that fall within the definition: (1) evidence about the victim as an individual; and (2) evidence regarding how the victim's death impacted his or her family. *See Flor*, 998 A.2d at 634. Section 9711(a)(2) does not grant a prosecutor *carte blanche* authority to submit evidence about every person or place upon which the victim had an impact. "Victim impact testimony is permissible when the Commonwealth establishes that the victim's death had an impact on the victim's family as opposed to presenting mere generalizations of the effect of the death on the community at large. Once this threshold has been met, the trial court has discretion over the testimony admitted." *Eichinger*, 915 A.2d at 1139-40. Freed from such limits, the focus of capital sentencing hearings would be on the victim and not upon the aggravating and mitigating circumstances that the General Assembly has required

jurors to weigh in order to decide whether to impose the death penalty upon the person convicted.

In *Payne*, the United States Supreme Court explained that victim impact evidence conveys to the jury that "the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne*, 501 U.S. at 825 (internal citation omitted). Notably, our General Assembly chose not to adopt so broad an understanding of victim impact evidence when it enacted Section 9711(a)(2), a provision that does not encompass the societal impact resulting from the victim's death. On occasion, we have permitted, within the context of admissible victim impact evidence, statements that related to circumstances beyond the two statutory classes. For instance, in *Commonwealth v. Singley*, 868 A.2d 403 (Pa. 2005), we considered as permissible victim impact evidence a statement that concerned the impact that the victim's death had at his job. The victim's fiancée explained that the victim's boss shut down the business for a few days after the victim's murder. The victim's boss also asked the fiancée to participate in an award ceremony recognizing the victim. *Id.* at 415. We explained that the victim's fiancée did not relay the information in a vacuum, but presented it in the context of the fiancée's involvement in the award ceremony and her family relationships after the victim's death. *Id.* We did not create—nor could we—an expansive exception to the statute that would permit evidence pertaining to a victim's impact on society, on his or her employer, or on anyone other than his or her family.

Before examining some of the victim impact evidence introduced to the jury in this case, it is important to recognize the juncture at which the jury receives such proof. The Commonwealth opens the evidentiary aspect of the capital sentencing hearing by offering evidence related to the proffered aggravating circumstances and to victim impact, if it so chooses, in its case-in-chief. However, because the sentencing phase of a death penalty

trial principally entails proof and consideration of aggravating and mitigating circumstances, the role of victim impact evidence necessarily is secondary. That evidence can be used by the jury only after it determines that at least one aggravating and at least one mitigating factor have been proven, such that the jury now is set to weigh those factors against one another. The jury is instructed that, if it finds no mitigating factors, it is not to consider the victim impact evidence at all.

The difficulty that this formula presents is patent and obvious. The jury hears and sees the emotionally compelling victim impact evidence *before* it decides whether (and which) aggravating and mitigating factors exist. The jury is told to ignore that victim impact evidence temporarily, an instruction that would challenge even the most austere and detached juror, until the jury completes its primary task. Where, as here, the victim impact evidence is extensive and overwhelming, ignoring that evidence, even momentarily, becomes even more challenging. Jurors hear and see intensely emotional evidence, but then are told that they cannot let that evidence influence their initial decisions as to the existence of aggravating and mitigating factors. But this is the regime created by our General Assembly. It is accordingly the sequence that the trial court directed the jury to follow in this case.. We must bear this evidentiary sequence and order of proof in mind when we consider whether a particular body of victim impact evidence improperly influenced a jury's decision. In my view, this statutorily-prescribed sequence has particular relevance to this particular case, a case in which, as I describe below, the victim impact evidence that the court admitted was overwhelming, to an unconstitutional degree.

Critically, Frein's claim is not premised upon whether any specific item of evidence may, or may not, have exceeded the statutory limitations. Rather, he seeks relief on constitutional grounds. More specifically, Frein contends that, both as to quantity and nature, the trial court's admission of the victim impact evidence was not only an error of

law or an abuse of discretion, but, more importantly, a violation of his right to due process, a claim that the Supreme Court of the United States has recognized as viable. In *Payne*, the high Court held that "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when victim impact evidence "is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair[.]" *Payne*, 501 U.S. at 825. Having reviewed the record closely, I conclude that such circumstances are present here.

The Majority recognizes that the victim impact evidence proffered by the Commonwealth in this case was "extensive." Maj. Op. at 32. But this characterization is an understatement. On April 20, 2017, the sentencing phase of Frein's trial commenced. In support of its proposed aggravating factors, the Commonwealth incorporated the entirety of the trial testimony into the sentencing record, a common (and judicially appreciated) effort that avoids duplicative and lengthy witness examinations during the Commonwealth's case-in-chief at the penalty phase. Then, the Commonwealth commenced presentation of its victim impact evidence. The Commonwealth's proof was not limited in scope or in duration. The Commonwealth introduced testimony from ten different witnesses, each of whom provided sensitive or passionate information for the jury to consider. The jury heard this testimony over the course of two days. The witnesses included Corporal Dickson's wife, sister, mother, and father. A number of Corporal Dickson's fellow PSP troopers also testified. The Commonwealth presented to the jury over thirty photographs showing Corporal Dickson at graduations, on vacations, and with his children and nephew, as well as a video of Corporal Dickson interacting with his family. The Commonwealth also played for the jury a fifteen minute film of Corporal Dickson's graduation ceremony from the Pennsylvania State Police Academy, a film that included several speeches by law enforcement personnel.

The constitutional difficulty in this case arises not because some of this evidence may have exceeded Section 9711(a)(2)'s statutory limits.[4] The presentation was problematic because the amount and the substance of that evidence, taken as a whole, overwhelmingly infected the fairness of the sentencing proceeding, in violation of Frein's due process rights. As noted, the Commonwealth introduced over thirty photographs. Many of the photographs depicted Corporal Dickson at various points in his life and with members of his family. Other photographs did not.[5]

---

[4] I disagree with Justice Donohue's suggestion that Frein cannot succeed on his due process claim because he did not object to some of the Commonwealth's evidence on statutory grounds. C.O. at 5-6. The constitutional and statutory claims are distinct. The viability of one is not dependent upon taking any action relative to the other.

Frein's due process claim rests upon both the quantity and the quality of the evidence presented by the Commonwealth. As a general matter, the success of a constitutional claim does not depend upon statutory objections. Justice Donohue may be correct that Frein's best argument would have been that some of the evidence did not meet the statutory definition of victim impact evidence. *See* C.O. at 6 n.2. That does not change the fact that objecting to the admissibility of evidence on statutory grounds is not a prerequisite to a due process claim. I am not aware of any precedent that requires a defendant to take such an action. The cases cited by Justice Donohue, *Commonwealth v. Eichenger*, 915 A.2d 1122 (Pa. 2007), and *Commonwealth v. Means*, 773 A.2d 143 (Pa. 2001), stand only for the general principle that a trial court is endowed with the authority and discretion to govern the admission of evidence, and that, even with regard to victim impact evidence, the court may exclude unduly prejudicial information. These cases do not require a defendant to object to potentially prejudicial material on statutory grounds before a constitutional challenge can ripen.

It may well be that, from Frein's perspective, the best course of action would have been to object on both constitutional and statutory grounds. However, whether tactical decision or blunder, Frein's counsel did not raise any statutory objections. Failure to do so does not defeat or extinguish an otherwise valid due process claim, nor does it render the record any less prejudicial for such purpose. The Commonwealth either violated Frein's due process rights, or it did not. That inquiry is a constitutional question, not a statutory one.

[5] For example, the Commonwealth introduced photographs of Tiffany Dickson, Corporal Dickson's widow, in her nursing uniform as a student, at her nursing school graduation, and with her sons on the beach. These latter photographs do not concern the victim or the impact that his death had on his family. Rather, they served unavoidably to elicit human sympathy for Tiffany Dickson in any juror. There was also a photograph

As I view the record, it is clear that the number and the nature of the photographs presented to the jury overwhelmed the statutory purpose of victim impact evidence and created instead a passionate and emotional impression that was difficult, if not impossible, for any juror to set aside, even after a trial court's instruction. It is no easy task that we ask jurors to perform in death penalty cases. They are required to hear all of the victim impact testimony, but then to ignore it until ascertaining whether any aggravating or mitigating circumstances have been established. Standing alone, many of these photographs constitute fair and admissible victim impact evidence, capable of measured consideration by a jury. In the aggregate, however, the photographs are overwhelming, and they contribute to my conclusion that the extent of the victim impact evidence created a very real possibility of unfair prejudice.

But let us set aside the emotionally powerful photographs for now, because there is more. And, from a due process perspective, it is these additional items that tip the matter quite far over the constitutional brink. These other aspects of the Commonwealth's victim impact evidence exceeded any reasonable bounds for such proof, and indeed did

---

of the Dicksons on their honeymoon, which appears to have less to do with the impact of Corporal Dickson's death than it does to create a photographic, emotional history of the Dicksons' relationship.

The Commonwealth also introduced numerous photographs of Corporal Dickson's children. Those photographs depicted the following: Corporal Dickson and Tiffany Dickson with their elder son at the beach; Corporal Dickson and his eldest son holding his younger son shortly after his birth; Corporal Dickson teaching both children how to sing a children's song; the boys in Halloween costumes; the boys wearing Corporal Dickson's uniform; Corporal Dickson and his sons at the beach; Corporal Dickson teaching his eldest son to fish; Corporal Dickson assembling a play set with both boys; Corporal Dickson with his sons at the ceremony where he was promoted to Corporal; Corporal Dickson with his youngest son on a cruise ship; Corporal Dickson's oldest son in front of his casket; and Tiffany Dickson and both sons with Corporal Dickson's uniform on Mother's Day. Some of these photographs undeniably conveyed to the jury the fact that the children no longer had a father as a result of Frein's crime, normally a valid statutory purpose. Some of the photographs went further afield, such as the children alone in Halloween costumes or wearing their father's trooper uniform.

not constitute fair victim impact evidence at all. One of the most pronounced examples occurred during Tiffany Dickson's testimony. She described in detail for the jury the complications that she endured during the birth of the couple's second child. The description was impactful and powerful. In this context, it was also unduly prejudicial. The delivery-related complications led to Tiffany. Dickson being placed under anesthesia. When she awoke, she learned that Corporal Dickson had held his newborn son to her breast for feeding while she was unconscious. The obvious point of the testimony was to provide another example of Corporal Dickson performing a worthy act for his family, which, again, normally is not inadmissible or otherwise problematic for victim impact evidence purposes. However, the striking and graphic testimony concerning the child's delivery that preceded Corporal Dickson's involvement carried with it too great a potentiality to prejudice the emotions of average (indeed, any) jurors. Such testimony can serve only to inflame the passions of those called upon to decide between life and death.[6]

The Commonwealth also played the film of Corporal Dickson's graduation ceremony from the Pennsylvania State Police Academy, a ceremony that occurred in 2007.[7] This film, which I have reviewed closely, included a speech by Mark Tranquilli, Esquire, who was then a Deputy District Attorney and the chief homicide prosecutor for

---

[6] I agree with the Majority that Tiffany Dickson's recollection of the delivery of her child was consistent with that which many women experience. I intend nothing here to downplay or disparage that experience. The Majority misses my point. My point is that, as the Majority puts it, the testimony was indeed "vivid," M.O. at 33-4 n.23, and it was "vivid" to such a degree that I am not convinced that the jury was permitted to perform its weighty function according to the sober dictates of due process. This is particularly so in light of the fact that Tiffany Dickson's emotional testimony must be considered in conjunction with the rest of the Commonwealth's evidence.

[7] *See* N.T., 4/21/2017, at 80-81, Exh. 574.

Allegheny County.[8] Attorney Tranquilli's speech was moving, articulate, and powerful. The speech also was wholly irrelevant and exceptionally prejudicial here. The speech was not victim impact evidence at all. It was error for the trial court to allow the Commonwealth to play the speech for this jury. Extolling the virtues and values of law enforcement, Attorney Tranquilli commended the graduating PSP troopers for entering the "war . . . between servants of light and the forces of darkness." Attorney Tranquilli then detailed the facts of an ambush murder of a PSP corporal by a drug dealer, a case that Attorney Tranquilli had recently, successfully prosecuted. Attorney Tranquilli used the story to highlight the bravery and valor displayed by the murdered PSP corporal, and he challenged the new graduates to be the same type of dedicated and courageous law enforcement officer. Considering that the instant case also involved the ambush murder of a law enforcement officer (indeed, a fellow PSP corporal), and that Attorney Tranquilli's 2007 speech did not concern Corporal Dickson or the impact that Corporal Dickson's subsequent death had on his family, the screening of the speech served only to arouse and inflame the emotions and passions of the jury.

It may be that, viewed item by item and in isolation, much of the victim impact evidence was relevant and admissible as such. But our inquiry does not end there. When considered together in light of the sentencing phase as a whole, the victim impact evidence was so emotionally overpowering, and so extensive, that it necessarily inhibited the ability of this jury fairly to assess this case. The effect of this evidence was transformative. The victim impact evidence no longer was secondary—an aid in the jury's ultimate deliberation. Instead, whether by the quantity of emotionally evocative photographs, the graphic childbirth description, the irrelevant, and inarguably prejudicial

---

[8] The Honorable Mark Tranquilli now serves as a Judge of the Court of Common Pleas of Allegheny County.

speech by Attorney Tranquilli, or a combination of all these things, it is impossible not to conclude that the victim impact evidence took on the predominant evidentiary role for the Commonwealth. It far exceeded, in quantity and quality, the inquiry concerning aggravating and mitigating circumstances upon which the death penalty decision principally (and statutorily) depends. The extent and nature of the victim impact evidence in this case displaced the calculus designed and prescribed by our death penalty statute and, indeed, rendered that statute's provisions functionally irrelevant.

At minimum, there existed a strong likelihood that the victim impact evidence was so extensive, and so emotionally charged, that it prejudiced the jury to the degree that the jurors were incapable fairly of assessing the existence of aggravating and mitigating factors. For this reason, I am compelled to disagree with the Majority's holding that the general presumption that juries follow a trial court's instructions sufficed to ensure that the jury here was not influenced by this overwhelming body of emotional evidence. A presumption of the kind that the Majority invokes serves as the starting point of the analysis; it is not the entirety of that analysis. The presumption is not irrebuttable, else there would be no limit to the Commonwealth's ability to present victim impact evidence, so long as the trial court provided the instruction. A litigant always can attempt to demonstrate that an instruction was incapable of curing any defect, and that the general presumption should not apply. In my view, this is one of the rare cases in which that occurred.

\* \* \*

I would hold that the victim impact evidence was of such a quantity and character that, even considering the trial court's instruction to the jury, the resultant prejudice rendered the proceeding fundamentally unfair. *See Payne*, 501 U.S. at 825. Our death penalty system requires the jury to hear victim impact evidence before determining

whether aggravating and mitigating factors were established. Where, as here, the evidence was so prejudicial as to constitute a due process violation, the core deliberative process necessarily was tainted and the error in permitting such extensive evidence was not harmless. Frein is entitled to a remand for a new sentencing hearing. As the Majority holds otherwise, I respectfully dissent as to Part III of its opinion and as to the ultimate decision not to afford Frein a new sentencing hearing.